PASCUAL RAMÍREZ ORTIZ, demandante y recurrido, *v.* ELIEZER y ROSENDO GAUTIER BENÍTEZ, demandados y recurrente el segundo.

*Número:* 257    *Resuelto:* 27 de febrero de 1963

A. *Mieres Calimano,* abogado del recurrente; *Guillermo S. Pierluisi* y *Francisco M. Monserrate,* abogados del recurrido.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

El Juez Asociado Señor Hernández Matos emitió la opinión del Tribunal.

Para el 1ro. de junio de 1954, Rosendo Gautier Benítez, constructor de obras, tenía a su cargo la construcción de un edificio en la Avenida Ponce de León, de Santurce. Como maestro de obras o capataz en la misma trabajaba su hermano Eliezer Gautier Benítez, de unos 29 años de edad, quien tenía hogar propio en el sitio "Las Parcelas" del Barrio Sabana Llana, de Río Piedras. El trabajo en la obra comenzaba a las siete de la mañana y terminaba a las cuatro de la tarde. Eliezer era dueño de una pequeña guagua, tipo "station wagon"; la utilizaba para ir a su trabajo y regresar a su hogar. Ese vehículo no era usado en actividad alguna de la obra ni en negocios de Rosendo Gautier. Los materiales para la obra eran llevados en vehículos de los suplidores.

Después de las cuatro de la tarde de ese día, Eliezer, ya terminada su jornada como maestro o capataz de obras, emprendió el regreso a su hogar conduciendo su propio vehículo. Mientras discurre por la Avenida 65 de Infantería, le ocurre un accidente con Pascual Ramírez Ortiz, quien, a la sazón, empujaba un carrito de mano por la misma avenida. Ramírez Ortiz resultó seriamente lesionado.

El 7 de octubre de 1954, y ante la Sala de San Juan del Tribunal Superior, Pascual Ramírez Ortiz presentó demanda contra los hermanos Eliezer y Rosendo Gautier Benítez, reclamándoles $25,000 por los daños y perjuicios que sufrió con motivo del accidente. Respecto al primero —Eliezer—

alegó que lo había arrollado negligentemente con un vehículo de motor mientras discurría por la mencionada vía pública. Respecto a la responsabilidad de Rosendo Gautier Benítez, expuso:

"2.—Al momento del accidente actuaba el demandado Eliezer Gautier Benítez como agente o empleado del demandado Rosendo Gautier y en ocasión de su empleo."

Contestaron la demanda los hermanos demandados. Eliezer, en síntesis, negó que en el accidente mediara negligencia de su parte y expuso que "se debió a la negligencia contributoria del demandante." Además, alegaron:

"2. En contestación a los hechos alegados en el par. 2 de la demanda, niegan los demandados, por ser falsos, que Eliezier Gautier Benítez actuara en el momento del accidente como agente o empleado del demandado Rosendo Gautier, y que el accidente ocurriera en ocasión de su empleo, alegando que a la hora, sitio y fecha en que ocurrió el accidente, el demandado Eliezer Gautier Benítez conducía un vehículo de su propiedad y en gestiones personales."

Trabada en esos términos concretos la contienda, fue el caso a juicio. Para la fecha de éste, 6 de octubre de 1959, el demandante estaba representado por letrados distintos a los que habían suscrito su demanda. Por la parte demandante declararon Julio Torres, José A. Ortiz Ramírez [sic] y el propio demandante Pascual Ramírez Ortiz, y por los demandados únicamente declaró Rosendo Gautier Benítez. Para esa época Eliezer residía en Nueva York, a donde se había trasladado con su familia hacía unos dos años.

El 21 de diciembre de 1959 se falló el pleito por sentencia que declaró con lugar la demanda y condenó solidariamente a ambos hermanos Eliezer y Rosendo Gautier Benítez a pagar al demandante una indemnización montante a $12,000. El primero, según el tribunal, "pagará por su negligencia y *Rosendo Gautier en cumplimiento de su obligación contractual.*" [Énfasis suplido.] Las conclusiones del tribunal a quo fueron las siguientes:

"El demandante es un obrero no diestro que a las cuatro de la tarde del 1 de junio de 1954 empujaba un carrito de mano, con comida para cerdos, por la Avenida 65 de Infantería, a la salida de Río Piedras para Carolina.

"El codemandado Eliezer Gautier Benítez, conduciendo un vehículo de motor aparentemente de su propiedad, arrolló al demandante que caminaba por su derecha y quien no cometió acto negligente alguno que provocara el accidente.

"La evidencia presentada en el juicio sobre la forma en que ocurrió el accidente indica que éste fué ocasionado por la negligencia crasa del codemandado Eliezer Gautier Benítez, hermano menor del otro demandado, Rosendo Gautier. Eliezer era capataz y empleado de Rosendo en una de las obras que como contratista hacía Rosendo. Al suceder el accidente, Eliezer le dijo al demandante que no se apurara que su hermano pagaría los gastos.

"Al día siguiente del accidente, por la mañana, el Sr. José A. Ortiz, en representación del demandante, fue a la residencia de Rosendo a hablarle sobre el accidente y Rosendo le admitió que él se hacía responsable por los daños y perjuicios causados por Eliezer. Delante del señor Ortiz, Rosendo llamó a la compañía de seguros del vehículo, pero un empleado de ésta le informó que la póliza de ese vehículo había vencido hacía trece días. Rosendo le dio al señor Ortiz $20.00 para cubrir gastos del demandante y le dijo que si necesitaba más que volviera. No le cobró a su hermano Eliezer los $20.00. Ortiz no volvió donde Rosendo y el 7 de octubre el demandante radicó la demanda contra los dos demandados, quienes han sido representados por el mismo abogado.

"El demandante sufrió en el accidente fracturas en ambas piernas. Estuvo durante año y medio enyesado en el Hospital Municipal de Río Piedras. Sufrió una operación en la cual le pusieron tornillos ortopédicos. Tiene una gran cicatriz en la pierna izquierda y todavía, a pesar de que han transcurrido cinco años, está bajo tratamiento. Entendemos que los daños y perjuicios sufridos por el demandante ascienden a doce mil dólares ($12,000.00).

"*Conclusiones de Derecho.*—No hay dificultad en afirmar que Eliezer Gautier Benítez ocasionó por su negligencia el accidente y por lo tanto debe indemnizar al demandante por los daños y perjuicios; pero como su hermano mayor y patrono

es también demandado, tenemos que resolver sobre la responsabilidad de éste.

"Es cierto que Rosendo Gautier Benítez negó en su testimonio en corte que el vehículo envuelto en el accidente le perteneciese; que Eliezer anduviera en gestiones de su empleo; y que él asumiera responsabilidad ante el representante del demandante. Pero al analizar toda la evidencia en este caso llegamos a la firme conclusión que debemos darle crédito a la prueba de la parte demandante y por ello establecemos que Eliezer, en el momento del accidente, le informó al demandante que su hermano Rosendo se haría cargo de los gastos; que Rosendo llamó a la compañía de seguros en gestiones para la indemnización al demandante; que le dio $20.00 al señor Ortiz y le ofreció darle más; y que aceptó ser responsable de los daños y perjuicios que padeciera el demandante.

"En estas condiciones procede declarar con lugar la demanda en cuanto a los dos demandados para que ambos, solidariamente, indemnicen al demandante. Rosendo se obligó voluntaria y válidamente a indemnizar al demandante y esto de por sí basta, ya que muchas son las posibles causas o razones por las cuales Rosendo se obligó. Pueden ser algunas de las siguientes causas: (1) que en realidad Eliezer anduviera en gestiones de su empleo con Rosendo en un vehículo perteneciente a Rosendo; (2) que las relaciones comerciales y de trabajo o familiares entre los dos hermanos le indicaran a Rosendo su deber y su responsabilidad en ese caso, y (3) la conveniencia de Rosendo para sus relaciones públicas de no cuestionar su responsabilidad; etc."

Del fallo recurrió ante nos únicamente Rosendo Gautier Benítez y como error fundamental señala, en síntesis, el haber resuelto el tribunal sentenciador que él se había obligado a indemnizar al demandante todos los daños y perjuicios que éste sufriera con motivo de dicho accidente.

El cuidadoso análisis y estudio que hemos hecho de toda la evidencia oral ofrecida por las partes, de su valor probatorio, verdadera significación y alcance jurídico, nos ha convencido en absoluto que ese fundamental y serio error fue clara y evidentemente cometido y que, consecuentemente, la sentencia recurrida, en cuanto responsabiliza y se refiere al

codemandado Rosendo Gautier Benítez, debe ser revocada y que la demanda debe desestimarse en lo que a él concierne.

Como ya expusimos, al codemandado Rosendo Gautier Benítez, a través de la única demanda, se le exigió la responsabilidad aquiliana porque "al momento del accidente" su hermano Eliezer actuaba como su agente o empleado y "en ocasión de su empleo." Sin embargo, el fallo en su contra se fundamentó en una causa de acción muy distinta, es decir, en una "obligación contractual", porque "Rosendo se obligó voluntaria y válidamente a indemnizar al demandante y esto de por sí basta . . ."

En torno a esa presunta asunción de responsabilidad "por los daños y perjuicios que padeciera el demandante", encontramos los siguientes incidentes y manifestaciones en la transcripción de la evidencia:

El primer testigo que declara es Julio Torres que, según él, presenció el accidente. Entre otras cosas dijo que, mientras echaban al herido dentro del vehículo de Eliezer éste le dice: "No se apure, que nosotros le pagamos los gastos; el hermano mío le paga los gastos." Se pide por el letrado de los demandados la eliminación de estas manifestaciones y el tribunal las elimina respecto a Rosendo, haciendo constar: "Se entenderá que esa manifestación no compromete al Señor Rosendo Gautier."—Tr. 4

El segundo testigo fue José A. Ortiz, hermano del demandante, quien declaró que supo del accidente como a las siete y media de la noche del día siguiente al mismo; que fue entonces al hospital; que un médico pidió un litro de sangre para una transfusión y a él entonces le dejaron "un papel donde se necesitaba un litro de sangre"; —Tr. 37.—que fue donde el papá de Rosendo Gautier y le explicó "el asunto de la sangre y me dijo que no se podía hacer nada."—Tr. 10; que después habló con don Rosendo y éste le dio $20.00 para comprar la sangre y que, además, le dijo:

"Que él era responsable del accidente . . . que se hacía responsable de los daños y perjuicios." Tr. 10.

Se pidió la eliminación de esas palabras y el juez la denegó porque "es una manifestación contra interés del propio demandado que es admisible."

Manifestó este testigo también que Rosendo Gautier llamó "a la casa de seguro a ver si podía meter el carro para mandarlo a la clínica, pero el seguro le contestó que hacían trece días que se le había cumplido el contrato de seguro y no lo había renovado." —Tr. 11.

Cuando se le preguntó si "don Rosendo le dió algo a Ud. para llevarle a su hermano", contestó: "$20.00 . . . para ayudar en la sangre y me dijo que si necesitaba algo más que fuera allá. Después yo necesité un dinero y se lo cogí a Blas Benítez para un litro de sangre y no fuí allá." —Tr. 11. Según el mismo declaró, este litro de sangre se necesitó al día siguiente.—Tr. 37.(¹)

---

(¹) De la repregunta a este testigo transcribimos lo siguiente:

"P.   ¿Cuánto dinero le dio Don Rosendo?
"R.   $20.00
"P.   ¿Alguna otra vez le dio algún dinero?
"R.   No me volvió a dar más nada porque no fui donde él.
"P.   ¿Antes de entablar la demanda Ud. no fue donde él y le dijo deme tanto?
"R.   El me dijo a mí, ante la Corte de Río Piedras, frente al Cuartel, '¿que por qué yo había hecho eso?' Entonces yo le dije que ellos no habían correspondido como era; porque hasta el hermano fue a casa.
"P.   ¿Que por qué había hecho qué?
"R.   Que por qué lo había demandado.
"P.   ¿No dijo que más nunca lo vio después de los $20 para la sangre?
"R.   En el caso del juicio en Río Piedras, que fue el caso archivado porque no dejaron hablar al muchacho, yo le contesté que no podía, tenía que demandar porque él se había hecho responsable de los daños y perjuicios.
"P.   ¿Por qué no le dijo deme $2,000?
"R.   Ellos quedaron en volver y no volvieron.
"P.   ¿No fue Ud. que fue a la casa de don Rosendo?
"R.   Sí, señor.
"P.   ¿Es o no cierto que fue a la casa de don Rosendo a buscar $20 para una transfusión de sangre?
"R.   Sí, señor.

Pascual Ramírez, el demandante, repitió lo que había dicho su primer testigo, o sea, que cuando se le conducía al hospital, Eliezer le dijo: "No te apures, el hermano mío Rosendo, te va a pasar; voy a hablar con él para que te pase unos chavitos." —Tr. 20. —A petición de los demandados, esas manifestaciones también fueron eliminadas por el tribunal respecto al codemandado Rosendo Gautier. —Tr. 20.

Con la aclaración de que esas manifestaciones se repiten en el curso de los testimonios, ellas representan la única prueba aducida por la parte demandante que tendió a demostrar la supuesta asunción de responsabilidad por Rosendo Gautier, y por la cual no había sido demandado. A base de esos testimonios es que el juez inferior concluyó que "Rosendo se obligó voluntaria y válidamente a indemnizar al demandante y esto de por sí basta."

Al terminar de presentar el demandante su prueba, los demandados solicitaron la eliminación de Rosendo Gautier Benítez como parte demandada. La denegó el juez inferior en los siguientes términos:

"Hon. Juez: Un vehículo comercial hay que probar que ha sido guiado en el momento del accidente por un agente o empleado del patrono en gestiones del empleo. Eso lo exige la ley. No procede, a mi entender, la moción de desestimación en cuanto a Rosendo Gautier si él le dijo a José A. Ortiz, hermano del demandante, que él se hacía responsable de los daños y per-

"P.   ¿Y se los dio?
"R.   Sí, señor, y dijo, cualquier cosa que suceda yo respondo.
"P.   ¿Cualquier cosa que suceda yo respondo?
"R.   Sí, señor.
"P.   ¿Cuántos días pasaron desde ese día que le dio los $20 hasta que volvió a ver, en la corte, a don Rosendo?
"R.   Eso fue como a los tres meses.
"P.   ¿No fue como más de un año? ¿Este caso no se pudo ver porque este señor estaba en el hospital?
"R.   Fue suspendido unas cuantas veces. Yo lo llevé en brazos a él a la Corte.
"P.   ¿Cuándo es que va a la Corte después del accidente? ¿No fue después de un año?
"R.   Después de un año, en Río Piedras.

juicios que pudiera sufrir el demandante, que le dió los $20.00, que le dijo que si necesitaba más volviera. Por esa prueba se declara sin lugar."

La declaración de José A. Ortiz, hermano del demandante y única persona que, por un momento, habló con Rosendo Gautier Benítez el 2 de junio de 1954, para pedirle ayuda para comprar un litro de sangre, no quedó sin contradecir en la parte de la asunción de responsabilidad. Fue específica y categóricamente contradicha por el propio Rosendo Gautier Benítez, [2] aunque el juez inferior no concedió entero crédito

"P.  ¿Durante ese año fue donde este señor a decirle: como Ud. dijo que era responsable, denos tal cantidad de dinero?

"R.  No fui porque ninguno atendió.  Yo dije: vamos a la corte.

"P.  ¿Ud. ha ido donde este señor a decirle, en algún momento: Ud. se comprometió a pagar los daños y perjuicios, denos tanto?

"R.  Yo fui una vez donde él.

"P.  ¿Ud. fue?

"R.  Yo fui una vez para cuestión de la sangre, para ver qué podía hacer.

"P.  ¿Le regaló $20?  ¿Después de eso volvió donde él?

"R.  No volví.

"P.  ¿Sabe si su hermano volvió donde él?

"R.  No volvió.

"P.  ¿Esta conversación que este señor dijo, según lo que dice al Tribunal, yo me hago responsable de eso; fue en presencia de su hermano?

"R.  En presencia de Visitación Sáez.

"P.  ¿Fue en presencia de este señor?

"R.  No, señor.

"P.  ¿Ud. le comunicó eso a su hermano?

"R.  Yo le expliqué lo que había hablado el señor.

"P.  ¿Qué dijo su hermano?

"R.  El no me dijo nada.  Veremos a ver.

"P.  ¿Su hermano no lo aceptó?

"R.  El lo aceptó el dicho; pero como él no podía hacer nada, yo trabajé el asunto y Visitación.

"P.  ¿Por qué si lo aceptó eso, su hermano, en ningún momento fue donde este señor a que le pagara?

"R.  Porque es asunto que eso tiene que ir a la Corte con su abogado y no podía hacerlo yo; porque yo no tengo autorización para eso.

[2] Su examen al respecto fue como sigue:

"Lic. Mieres Calimano:

a su testimonio.

Cuando se le interrogó sobre los seguros de sus carros, contestó:

"P. Mire Rosendo, dígame una cosa: ¿Ud. dijo que su hermano vivía en Las Parcelas, en la Carretera de Río Piedras a Carolina?

"R. De Sabana Llana.

"P. Diga al Tribunal si en alguna ocasión ese vehículo que tuvo el accidente con este señor, con Ramírez, perteneció a Ud.?

"R. En ningún momento.

"P. ¿Ud. está pero positivamente seguro?

"R. Bien seguro. Yo tengo muchísimos hermanos y cada uno tiene su carro.

"P. ¿Cuántos automóviles tiene Ud. actualmente?

"R. Tres automóviles.

"P. ¿En aquella época, cuántos tenía?

"R. Posiblemente tenía dos o tres. Sé que tenía más de uno.

"P. ¿Los automóviles suyos están asegurados?

"R. Siempre están asegurados.

"P. ¿Ud. está positivamente seguro que cuando este hombre fue a hablar con Ud. fue bien tarde?

---

"P. ¿Su nombre?

"R. Rosendo Gautier Benítez.

"P. ¿A qué se dedica?

"R. A constructor de obras.

"P. ¿En relación con este caso, con el automóvil accidentado en este caso, en algún momento, en alguna época o en alguna fecha, fue propiedad suya?

"R. No, señor.

"P. ¿De quién era ese carro?

"R. Era del hermano mío.

"P. Ahora le pregunto: ¿oyó la manifestación de este testigo, que dijo que había prometido pagar todos los daños y perjuicios en este caso?

"R. Sí, señor.

"P. ¿Esto es cierto?

"R. No es cierto.

"P. ¿Ud. sabe lo que es una demanda de daños y perjuicios?

"R. Sí, señor.

"P. ¿Ha bregado con contratos grandes?

"R. Sí, señor.

"P. ¿Sabe lo que es la responsabilidad de un ciudadano?

"R. He hecho obras para el gobierno. Ahora acabo de construir la Asociación de Empleados.

"R. Estaba oscureciendo.  Fue después del accidente.

"P. ¿De manera que no pudo llamar a ninguna compañía de seguros aunque hubiera querido?

"R. No es posible.  Si el caso no era caso mío."

Ante ese conjunto de hechos y circunstancias, no había dificultad alguna, como expuso el juez sentenciador, para concluir que el codemandado Eliezer Gautier debía indemnizar al demandante los daños y perjuicios que sufrió.  Empero, respecto al codemandado Rosendo Gautier la evidencia aportada por el demandante dejó de probar satisfactoriamente la alegación esencial de que "al momento del accidente actuaba el demandado Eliezer Gautier Benítez como agente o empleado del  demandado Rosendo Gautier y en ocasión de su empleo."  De algunas de las manifestaciones del juez de instancia en el curso del juicio se infiere que él era de este parecer mientras consideraba el caso independientemente de la promesa de pagar los daños y perjuicios atribuida a Rosendo y, evidentemente, lo fue cuando fundamentó su fallo

"P.  ¿Es un hombre que tiene conocimiento de lo que es la responsabilidad que puede asumir por un contrato?

"R.  Sí, señor.

"P.  ¿Quién construyó el edificio del Fondo del Seguro del Estado?

"R.  Un servidor.

"P.  ¿De manera que sabe lo que es la responsabilidad?

"R.  Sí, señor.

"P.  ¿En algún momento le dijo a ese señor, al hermano del demandante o a alguna otra persona en Puerto Rico que se haría responsable de los daños y perjuicios?

"R.  En ningún momento.

"P.  ¿Qué hay con relación a los 20 pesos?

"R.  Vino en un momento crítico, cuando un hermano mío ha tenido un accidente y él no tiene un centavo para pagar una transfusión de sangre; ¿cuál es mi deber como hermano y como humanitario? Darle el dinero.

"P.  ¿Cuánto le dio?

"R.  Algunos 20 pesos, exactamente no recuerdo.

"P.  ¿Se los regaló?

"R.  Sí, señor.

"P.  ¿Ud. entendió, en algún momento, que por Ud. contribuir a una transfusión de sangre, para que no se muriera un ser humano, Ud. asumía la responsabilidad?

"R.  En ningún momento.  No es posible."—Tr. 22-25.

508

contra Rosendo Gautier exclusivamente sobre una "obligación contractual" y no sobre la culpa aquiliana que se le imputaba en la demanda.

A lo que otorgó categoría de "obligación contractual" el tribunal de instancia fue al acto de manifestar Rosendo Gautier al hermano del demandante (en ocasión en que se le pedía cooperación económica para comprar sangre para la transfusión) que se hacía responsable de los daños y perjuicios que sufriera el demandante. [3]

Veamos si tal declaración unilateral de voluntad —aceptando su existencia como la aceptó el juzgador y que fuera admisible como evidencia— bastaba por sí misma para obligar a su autor a reparar los daños imputables a su hermano Eliezer.

La declaración de voluntad unilateral que la ciencia jurídica estima vinculante es la promesa o expresión de voluntad unilateral, autónoma, gratuita, revocable, no aceptada, por la que, con certeza, nos imponemos la firme obligación de dar, hacer o no hacer alguna cosa en provecho de otro, capaz de conferir a éste el derecho a exigir su cumplimiento o el de resarcirse de los consecuentes daños y perjuicios que hubiere realmente sufrido por lo que hiciera con vistas a dicha promesa y realmente inducido por ella.

█ Nuestro Código Civil no reconoce ni reglamenta la declaración unilateral de voluntad como fuente de obligaciones. [4]    Estas nacen, según se dispone en su Art. 1042, de la ley, de los contratos y cuasicontratos, y de los actos y omisiones ilícitos o en que intervenga cualquier género de culpa o negligencia.

---

[3] A veces el testigo se refirió a tal manifestación como "lo que había hablado el señor", o "el dicho" de Rosendo Gautier.—T. 16.

[4] Pero para él no es una idea extraña. Se ocupa en sus Arts. 753 y 754 de la promesa de mejorar, en el 1340 de la de vender o comprar, y en el 1761 de la de constituir prenda o hipoteca, más bien como precontratos o contratos preparatorios o preliminares celebrados como antecedentes de contratos definitivos y perfectos.

Con las excepciones del juramento promisorio, del voto y la promesa unilateral de prestación a favor de un municipio, en Derecho romano la mera declaración unilateral de asumir una obligación no era suficiente para darle nacimiento. Aun el simple pacto no creaba una causa civil vinculante.

■ El problema de la voluntad unilateral como posible fuente de obligaciones ha sido universalmente discutido en los países europeos continentales. Todos los autores aceptan que la tradición jurídica ha sido contraria a la obligatoriedad de la promesa unilateral. Unos han admitido el principio de la declaración unilateral como creador de obligaciones; otros, los menos, lo han rechazado. Castán dice que hay que reconocer que la doctrina cuenta cada día con mayor número de partidarios y que en el terreno de la política legislativa podemos ver que los Códigos más modernos admiten en ciertos casos la eficacia obligatoria de la promesa unilateral, citando a los de Alemania, Suiza, Italia, Brasil, Méjico y Perú.(⁵)

(⁵)*Derecho Civil Español, Común y Foral*, Octava edición, Tomo 3, pág. 61.

El mejicano, edición de 1932, reconoce y regula varios actos, bajo el epígrafe "De la declaración unilateral de la voluntad", en sus Arts. 1860 al 1881. Los primeros cuatro dicen:

"Art. 1860—El hecho de ofrecer al público objetos en determinado precio, obliga al dueño a sostener su ofrecimiento.

"Art. 1861—El que por anuncios u ofrecimientos hechos al público se comprometa a alguna prestación en favor de quien llene determinada condición o desempeñe cierto servicio, contrae la obligación de cumplir lo prometido.

"Art. 1862—El que en los términos del artículo anterior ejecutare el servicio pedido o llenare la condición señalada, podrá exigir el pago o la recompensa ofrecida.

"Art. 1863—Antes de que esté prestado el servicio o cumplida la condición, podrá el promitente revocar su oferta, siempre que la revocación se haga con la misma publicidad que el ofrecimiento.

"En este caso, el que pruebe que ha hecho erogaciones para prestar el servicio o cumplir la condición por la que se había ofrecido recompensa, tiene derecho a que se le reembolse." Véase *Compendio de Derecho Civil*, Tomo III, págs. 198–231 (1962) del catedrático mejicano Rafael Rojina Villegas.

El Art. 1089 del Código Civil español —igual al 1042 nuestro— no menciona la voluntad unilateral como fuente de obligación, pero tampoco, como afirma Castán, en su citada obra, la registra como obstáculo insuperable para su construcción técnica y Garrigues sostiene que dicho artículo no contiene propiamente ninguna norma, sino una clasificación que no puede vincular al intérprete. (6)    Albaladejo, en sus *Instituciones de Derecho Civil*, Tomo I pág. 613 (1960) comenta que el silencio que sobre la voluntad unilateral guarda el Art. 1089 no serían obstáculo para considerarla fuente, "Ya que hemos visto (aparte de sus imperfecciones) que no enumera todas las fuentes que acoge nuestro Derecho, y la voluntad unilateral podría ser una de éstas no enumeradas." Hernández-Gil es uno de sus defensores más entusiastas. (7)

(6) *Curso de Derecho mercantil*, Tomo II, pág. 70.

(7) En el Tomo 1 de su obra *Derecho de Obligaciones*, (1960), págs. 246 y 247, en parte, nos dice:

"84. c. *La Promesa Unilateral*.

"Finalmente, hay que incluir en este grupo la *promesa unilateral* como fuente de las obligaciones. El problema es debatido. Nuestro ordenamiento jurídico no lo afronta de modo directo y la jurisprudencia (en contraste con la excelente tarea de progresivo perfeccionamiento desarrollada a propósito de diversas materias) no ha llegado a resolverle con claridad. En principio hay que sostener, de acuerdo con el parecer más generalizado, que si bien no toda declaración unilateral de voluntad es siempre y sin más productora de obligaciones, la promesa de una prestación (en la que concurran todos los requisitos correspondientes a ésta) está dotada en ciertos casos de fuerza vinculante.

"El atribuir a la promesa unilateral fuerza vinculante es, sin perjuicio de algunos precedentes romanos y germánicos, una conquista relativamente reciente. En el plano sicológico-jurídico, la máxima concesión a la voluntad en la producción de las obligaciones la representa el que, por obra estrictamente de una sola voluntad (sin la concurrencia de otra concordante que da lugar, en términos amplios, a la figura del contrato), advenga obligado el emitente. La obligación en este caso es, en el sentido más absoluto, una auto-obligación. El deber incorporado a la declaración unilateral presupone el reconocimiento de un poder autónomo. Y, sin embargo, se da la circunstancia de que la atribución de fuerza vinculante a la promesa unilateral no coincide, al menos en su desarrollo, con el apogeo del dogma de la autonomía de la voluntad. Es un logro posterior que se abre paso en el período de rectificación y crisis del dogma de la autonomía, el cual, partiendo,

Puig Brutau considera el problema en el aspecto de la influencia que puede tener la promesa unilateral sobre los intereses ajenos.(8)

Carece de uniformidad la doctrina del Tribunal Supremo español respecto a la fuerza vinculante de la promesa unilateral. Ha asumido posiciones contradictorias en las sentencias que sobre este punto ha pronunciado desde el 12 de enero de 1881 hasta el 21 de marzo de 1957. La ha negado fundándose en que las oblgaciones sólo pueden nacer de las causas que enumera el Art. 1089; por excepción la ha admitido

claro es, del poder de la voluntad, hacía recaer su eficacia jurídica no tanto en ella misma cuanto en el pacto libremente concertado. Pero ha de advertirse (y de ahí que sólo sea aparente la contradicción apuntada) que no es propiamente una sobreestimación de la voluntad, un extraer de ella una última consecuencia, lo que ha llevado al reconocimiento de la promesa unilateral como fuente de las obligaciones. La tesis se ha instaurado, no sobre bases sicológicas de signo voluntarista, sino a virtud principalmente de consideraciones sociológicas y sistemáticas. Se piensa que ciertas declaraciones del individuo, concernientes a intereses tutelados por el Derecho, que adquieren una general exteriorización o que se dirigen a un concreto destinatario, como ocurre, respectivamente, con la promesa pública y la oferta de contrato, no pueden quedar relegadas al puro arbitrio; tales declaraciones, constitutivas de promesas de un obrar determinado, aparecen dotadas de una trascendencia social a impulsos de la actuación del emitente que, por propia iniciativa, suscita el interés y la confianza de los demás. Y así las cosas, razones de seguridad jurídica y exigencias de la buena fe demandan que el destinatario concreto o eventual tenga derecho a convertirse en acreedor, lo cual sólo es posible si sobre el promitente incide como deber el mantenimiento de la promesa que, por lo mismo, ha de reputarse irrevocable, al menos dentro de ciertos límites. En otro aspecto, razones de índole sistemática—la explicación de ciertos efectos jurídicos—se han erigido en argumentos favorables a la promesa unilateral: la obligación que asume el emitente del título al portador frente a cualquier tenedor del mismo descansa, en último término, en el acto unilateral de la creación; el contrato a favor de terceros pierde toda significación jurídica propia si se hace descansar su fuerza vinculante estrictamente en la aceptación. Algo semejante ocurre con la promesa abstracta de deuda o con el acto de constitución de una fundación. Estos y otros casos, de dudosa estructuración jurídica, revelan un indiscutible fondo de unilateralidad."

(8) En su obra "Fundamentos de Derecho Civil", Tomo I, Vol. II, págs. 85 y 86, (1959), comenta:

"A nuestro juicio, el problema está mal planteado si se considera que deben averiguarse las virtudes de una voluntad declarada, desli-

como una necesidad social, a base del espiritualismo del moderno derecho de obligaciones y del crecimiento y diversidad de los negocios jurídicos. Su actual posición más bien es favorable a la fuerza vinculante.(⁹)

Al rastrear precedentes sobre esta materia en nuestras decisiones, nos hemos topado con algunas que presentan si-

gada de la valoración de los intereses de quien puede haber confiado en ella. La ocasión es sumamente propicia para recordar que el Derecho, en general, sólo tiene sentido como medio de regular los intereses en conflicto de dos o más personas. Quien contrata ha de quedar obligado por lo que resulta del contenido de su voluntad, en cuanto enlaza con la voluntad igualmente manifestada de otro sujeto de derecho. En el contrato ya existe, por el solo hecho de quedar perfeccionado, la presunción favorable a entender que lo convenido ha de cumplirse para que no se perjudiquen los legítimos intereses de la parte que ha confiado en la otra. Pero es irreal suponer que el declarante que ha manifestado unilateralmente su voluntad no ejecuta un acto que puede influir en los intereses ajenos. La vinculación resultante de la declaración no puede ser resultado del hecho aislado de haberse ésta manifestado, sino de su valoración conjuntamente con la conducta observada por quien ha confiado legítimamente en la declaración. La doctrina moderna del 'contacto social', que en definitiva no representa más que la clara exposición de unos indudables criterios de política jurídica proclamados en relación con una más detenida y minuciosa observación de la realidad, puede facilitar la comprensión de los efectos que debe tener atribuidos, en ciertos casos, la voluntad declarada de manera unilateral y mantenida, por lo menos aparentemente, frente a la actividad de quien puede haber confiado en la declaración. Por ello cabe citar la observación de Nirk, con referencia a un estudio de Ballerstedt, en el sentido de que este autor ha demostrado la necesidad de distinguir dos formas fundamentales de eficacia de la voluntad de negociación jurídica: la que funda la obligación en la voluntad declarada y la que debe fundarse en la fuerza de la confianza depositada en la declaración. Lo mismo puede expresarse con palabras que proceden de la esfera doctrinal del *common law*: ' El típico efecto mínimo que debe reconocerse a los actos unilaterales es que dejan fundado un *estoppel*. Este evita que el sujeto . . . al que es imputable el acto unilateral pueda actuar en contradicción con su voluntad declarada.'

"Podrá objetarse que la protección de la confianza depositada en la declaración no justifica que se decrete la vinculación del declarante al cumplimiento de la misma obligación ofrecida, sino que únicamente puede justificar que se considere el alcance del perjuicio sufrido por quien ha confiado. Según este criterio, la declaración unilateral de voluntad sólo serviría, en su caso, para considerar que el declarante ha incurrido en responsabilidad extracontractual."

(⁹) La doctrina sentada por la de 21 de marzo de 1957, Tomo LX, *Nueva Serie, Jurisprudencia Civil*, págs. 701 y siguientes, es como sigue:

tuaciones bastante análogas a las del presente caso, aunque no discuten el problema.

En *Moringlane & Lledó* v. *Skerret*, 44 D.P.R. 874, 881 (1933), se había hecho por un ingeniero, voluntariamente pero bajo cierta condición, la promesa de entregar a una sociedad uno de los ancones que a ésta había dado en arrendamiento el Municipio de Ponce. Incumplida la promesa, fue demandado el ingeniero en reclamación de daños y perjuicios. La sentencia desestimó la reclamación. Confirmamos el fallo. En parte nos expresamos así:

"Tal es el caso. La cuestión a resolver envuelto en el mismo no es fácil en verdad. En su estudio a veces nos ha parecido que asiste la razón a la demandante, pero al tratar de basar nuestra conclusión, no hemos podido establecer por completo el nexo jurídico por virtud del cual se encuentre obligado para con ella el demandado en el sentido en que la reclamación se interpone.

"Nuestro Código Civil reconoce expresamente como fuente de obligaciones no sólo la ley y los contratos sí que también los cuasi contratos, que define como 'los hechos lícitos y puramente voluntarios, de los que resulta obligado su autor para con un tercero y a veces una obligación recíproca entre los interesados.' Artículos 1042 y 1787 del Código Civil, ed. 1930. Regula sola-

"Si bien es cierto que la doctrina jurisprudencial no es uniforme, y en algunos casos se ha pronunciado negando virtualidad al negocio jurídico unilateral, cual resulta de las sentencias de 12 de enero de 1881, 15 de abril de 1924 y 21 de junio de 1945, también lo es que la más nutrida y moderna jurisprudencia se muestra propicia al reconocimiento, siquiera sea a veces por vía de excepción, de la eficacia de la obligación unilateral, en principio y de acuerdo con las circunstancias concurrentes en el caso concreto contemplado, singularmente si la declaración de voluntad está dotada de certidumbre y va dirigida a determinada persona a título dispositivo y no de mera enunciación de un propósito, pues en estos supuestos cabe *in genere* dentro del amplísimo concepto que define el artículo 1.254 del Código Civil, como declaración de voluntad recepticia, y vinculativa de un derecho de crédito, que es recibida en la técnica jurídica con arraigo en el sentido espiritualista que en nuestro derecho antiguo le imprimió el Ordenamiento de Alcalá, robustecido por exigencias de la buena fe y de la seguridad del tráfico, según se infiere de las sentencias de 8 de febrero de 1893, 31 de diciembre de 1924, 17 de octubre de 1932, 26 de mayo de 1950 y 1 de diciembre de 1955."

mente dos, la gestión de negocios ajenos y el cobro de lo indebido, pero estamos conformes con la apelante en que ello no quiere decir que sean esos dos los únicos cuasi contratos de que puedan derivarse obligaciones exigibles ante los tribunales de justicia. De suerte que aunque no se tratara como no se trata en este caso de gestión de negocios ajenos o cobro de lo indebido, si de los hechos lícitos y voluntarios que sin previa convención realizaron las partes pudiera derivarse alguna responsabilidad del demandado para con la demandante exigible ante los tribunales, éstos vendrían obligados a reconocerla con todas sus consecuencias. Esto es sencillo. Lo difícil, repetimos, es decidir si surge o no de los hechos de este caso un cuasi contrato perfecto entre demandante y demandado.

"    .    .    .    .    .    .    .    .    .

"¿Cuál era el derecho de la demandante ante la falta de cumplimiento del demandado dentro de un tiempo razonable? A nuestro juicio debió continuar reclamando la devolución y si no la obtenía poner el hecho en conocimiento del arrendador que era con quien había celebrado el contrato fuente clara de derechos y obligaciones, a los fines consiguientes. No lo hizo. Prefirió dejar el caso en lo incierto. Y a nuestro juicio no tiene ahora un derecho claro y perfecto en qué basar su reclamación directa contra el demandado, especialmente cuando no surge diáfano de los autos que la actuación del demandado le haya ocasionado algún perjuicio real y efectivo de que no pueda resarcirse entendiéndose con su arrendador."

En *Mercado v. Mercado*, 66 D.P.R. 38, 88 y 89 (1946), no le reconocimos fuerza vinculante futura a cierta costumbre observada por un causante de socorrer a un número de personas necesitadas, haciéndoles donativos de cantidades semanales. Sin embargo, en el mismo caso, obligamos a sus herederos a observar el cumplimiento de promesas que la misma persona había hecho a varios estudiantes necesitados e insolventes de pagarles los gastos que tuvieran hasta terminar sus respectivas carreras. Por haber mediado solicitud de la ayuda y aceptación de la promesa, conforme resulta de los autos del caso, la misma se había desarrollado en una obligación contractual trasmisible a los sucesores del promitente. Allí dijimos:

". . . al enviar a los estudiantes a los centros educativos del continente, comprometiéndose a sostenerlos económicamente hasta que terminasen sus estudios aun cuando realizó un hecho lícito y puramente voluntario, al ser aceptada su promesa por los estudiantes, el testador quedó contractualmente obligado para con dichos jóvenes. Si el Sr. Mercado, después de haber contraído esa obligación y de haber dichos jóvenes comenzado sus estudios, se hubiese negado a continuar sufragando sus gastos, no hay duda en cuanto a que hubiera podido ser compelido a cumplir el contrato por él celebrado. Esa obligación de carácter puramente contractual del causante se trasmitió a sus herederos desde el momento de su muerte, conforme al artículo 610 del Código Civil (1930).

"Por vía de ilustración haremos constar que la jurisprudencia americana resuelve casos similares al presente mediante la aplicación de la doctrina del *'promissory estoppel.'*

"Don Mario Mercado Montalvo no estaba obligado en manera alguna a proveer fondos para la educación de estos jóvenes estudiantes insolventes. El ofrecimiento que él les hiciera, como acto voluntario y de mera liberalidad, podía haber sido retirado o revocado por él en cualquier momento antes de que los beneficiarios de tal promesa, confiando en ella, cambiaran su posición, perjudicándose al así hacerlo. Los jóvenes en este caso cambiaron de posición. Tuvieron fe en el hombre noble y generoso que les ofreció lo que sus padres no podían darles—una carrera. Tenían la firme creencia—y en ello no se equivocaron—de que el señor Mercado cumpliría su promesa y no les abandonaría a mitad del camino. E inspirados por esa fe en su protector lo renunciaron todo y fueron al norte a estudiar y a demostrar, como demostraron, que eran dignos de la protección que se les ofreciera." (10)

---

(10) La aplicación de la doctrina de "promissory estoppel" nos fue planteada nuevamente en *Pabón* v. *Ayala*, 71 D.P.R. 938, 939 (1950). Las circunstancias específicas del recurso nos impidieron expresar criterio sobre su aplicación al caso. En él se trató de hacer cumplir una alegada promesa unilateral voluntaria hecha por el propietario de una finca por la que él se obligaba a conceder paso por su propiedad a otra persona que deseaba comprar una finca colindante. Sostenía esta otra persona que, descansando en esa promesa, compró la finca colindante, pero que después de adquirirla el demandado no había cumplido su promesa. El juez de instancia no le dio crédito a la evidencia presentada para probar la existencia de la promesa y desestimó la demanda. En el escolio (1) de la opinión dijimos:

El inolvidable maestro Jacinto Texidor, en su obra *El Derecho Civil en Puerto Rico, Obligaciones y Contratos*, pág. 17, siguiendo a Sánchez Román, nos dice que la ley "y los hechos" son las fuentes de toda obligación; entre éstos aquéllos lícitos, "voluntarios sin acuerdo de voluntades", o involuntarios, pero imputables a persona determinada y generadores de cierta responsabilidad. [11]

El profesor Velázquez en su obra de texto *Obligaciones y Contratos*, edición 1939, pág. 13, observa que las manifestaciones unilaterales de voluntad susceptibles de engendrar obligaciones son poco numerosas y que están sometidas *mutatis mutandi*, a las reglas generales que gobiernan los contratos. En su artículo "La *Consideration*, la Causa y el Derecho Puertorriqueño", publicado en la Revista del Colegio de Abogados, tomo XVI, núm. 2, pág. 5 (1956), sostiene que "en Derecho Civil la voluntad unilateral puede ser fuente de obligaciones." En la edición revisada de 1962 de aquella obra de texto, pág. 14, considera que "la fuente de obligaciones voluntarias es esencialmente contractual", citando al conocido jurista francés Josserand. Por lo que nos dicen Rojina Villegas —obra y tomo antes citados— y Raymundo M. Salvat, en su *Tratado de Derecho Civil Ar-*

---

"(1). El apelante cita la definición que se da en 19 Am. Jur. 657-8, sec. 53, de esta doctrina y la cual es la siguiente:

" ' . . . De acuerdo con dicha doctrina, un estoppel puede surgir al hacerse una promesa, aun sin causa, si fue la intención que se confiara en la promesa y de hecho se confió en ella, y el rehusar cumplirla sería virtualmente sancionar la perpetración de un fraude o resultaría en otra injusticia.' "

Por el mismo fundamento dejamos de aplicarla en *Luce & Co.* v. *Cianchini*, 76 D.P.R. 165, 179 (1954).

([11]) De la Primera Conferencia sobre obligaciones que contiene el citado tratado del profundo civilista, y magistrado que fue de este Tribunal, son estas orientadoras enseñanzas que aquí traemos cediendo a la irresistible tentación de reproducirlas como homenaje a aquel cerebro privilegiado:

"¿Cómo hemos de estudiar el Código? La contestación, a nuestro entender, es sencilla: estudiando el Derecho Civil.

"Está en moda ahora el estudio de la ley, no por la ley misma, sino por la jurisprudencia acerca de ella. Respetamos el sistema, pero

*gentino*, tomo I, sobre Fuentes de las Obligaciones, 2da. edición (1957), págs. 1–11, en Francia el problema sigue siendo blanco de apasionadas críticas y el movimiento doctrinal ha favorecido a la ley y al contrato como fuentes principales de las obligaciones civiles, bajo el fundamento de que toda obligación supone no sólo la voluntad del obligado, sino además la intervención del acreedor, porque nadie puede ser acreedor

---

no lo seguiremos, porque no nos presta la suficiente confianza, ni tenemos fe en su resultado.

"La jurisprudencia, respetable como lo es, no es la ley. Ante todo no concebimos la jurisprudencia mas que como un medio de *interpretación* de los preceptos legales. Es innegable que hay centenares de preceptos de ley que nunca han requerido interpretación, y cuyo régimen no ha sido jamás sometido a la decisión de un tribunal. Luego, estudiando por la jurisprudencia, nos dejamos sin conocer todos esos preceptos.

"La jurisprudencia es variable, hasta tornadiza en algunos casos. La ley, en sus altos principios, no lo es.

"La jurisprudencia se refiere a casos concretos, con extremos de hecho especiales; quitad o sustituid un hecho o una circunstancia, y la declaración del tribunal puede ser distinta. No olvidemos el famoso dicho: 'Justicia es, lo que de cinco, deciden tres.' En la ley no corremos este peligro.

"El estudio de la ley por medio de la jurisprudencia, fuera de dar a ésta la majestad que sólo la ley tiene, fuera de someter la ley, producto de la voluntad y del sentir jurídico de una Nación, al imperio de la voluntad y del sentir jurídico de los jueces de un tribunal, tiene otros graves inconvenientes. Es más fácil saber lo que se dijo en una ocasión, que decidir si a la luz de ciertos principios, aquello estuvo bien o mal dicho, si debió decidirse otra cosa, y por qué. Es mucho más fácil conocer, por la lectura, el criterio ajeno, que formar, por el estudio, el criterio propio.

"Pero en Derecho hay que tener propio criterio. No podréis cambiar la ley de un país, aduciendo como argumento que una alta autoridad judicial ha declarado en determinado sentido; y sí lo haréis demostrando que la ley vigente se aparta de los altos principios de justicia.

"Si estudiamos Derecho, preciso es que partamos de un punto de origen: la Justicia, la Moral, la Etica jurídica. ¿Qué es lo justo?— es la primera pregunta que nos debemos formular.

"Poseamos, en primer lugar, el principio filosófico y moral. Cada vez que estudiemos una institución, empecemos por investigar el principio filosófico, inmutable, eterno, que la creó, y que la rige.

"Pero ¿es esto todo?

"Aunque el principio sea único e incontrovertible, todas las instituciones legales, han tenido cambios históricos, circunstanciales, de desarrollo y de exteriorización. Forzoso es que conozcamos la historia

contra su voluntad sobre todo, respecto a un beneficio o provecho indeseable o no deseado.(¹²)

Por no ser necesaria la perfección consensual, por su unilateralidad; porque bastaría que una persona hiciera una simple declaración para que otra, de mala fe, pretendiera apoyar en ella la creación, transmisión, modificación y extinción de derechos; porque deben mantenerse la claridad y seguridad de las transacciones, es que, sin duda, varios Códigos modernos han acogido y reglamentado la promesa unilateral de una prestación por vía de excepción, respecto a casos aislados, y no le han atribuido una aplicación general y amplia en el campo de los negocios jurídicos. El solo hecho

de cada una de ellas.

"Y en posesión de los principios ético-jurídicos, de la filosofía de la institución, y de su vida y desarrollo, entremos en el estudio de su estado actual. Y con esos elementos, hagamos el estudio crítico de lo vigente en la materia.

"Y tendremos así el concepto propio, hijo de nuestro estudio, no mendigado del ajeno sentir y pensar.

"Hagamos el estudio como juristas; a eso aspiramos; y sólo por ese camino se llega a la aspiración.

"Dueño de los principios, el foco de la luz se halla en nuestro interior; con él iluminamos la teoría y la serie de hechos que se nos presentan en cada caso. Enfocamos de dentro a fuera; no nos llega la luz de una frase en esta sentencia y otra en aquélla; tenemos la luz solar del principio; y es bastante."

(¹²) Sin embargo, el mismo profesor Salvat, descansando en los expositores franceses en simpatía con la eficacia vinculante, a las págs. 10 y 11 del mencionado tomo I, aconseja el reconocimiento de la fuerza obligatoria en los siguientes párrafos:

"No es posible, en nombre de los principios tradicionales, rechazar una teoría surgida a requerimiento del tráfico moderno, que exige rapidez y seguridad en las transacciones.

"Es cierto que el reconocimiento de la fuerza obligatoria de la voluntad unilateral 'constituye la negación misma de la noción de obligación'; mas, no lo es menos que ello no basta para decretar su excomunión, ya que tal cosa equivaldría a negar la evolución jurídica en sí misma.

"Como bien ha escrito Edmundo Picard, 'el derecho, como toda la naturaleza física e intelectual, se transforma incesantemente en la realidad de sus manifestaciones concretas o positivas. Es esencialmente mudable y *proteico;* está constantemente en acción de deshacerse o rehacerse. Se encuentra en perpetuo estado de formación. Se desarrolla sin cesar como una tela enlazada al gigantesco cilindro del

de regimentarla excepcionalmente, puede considerarse como política de precaución y cautela.([13])

El derecho alemán, considerado la cuna de la promesa unilateral como fuente de obligaciones, reconoce en los Arts. 657 y siguientes y 793 de su Código Civil las siguientes formas nominadas de declaración unilateral de voluntad: (1) la promesa de fundación —dedicación de bienes a la realización permanente de un fin humano lícito en favor de otras per-

---

destino. Lanza sin interrupción su fuerza íntima al espacio en imágenes siempre nuevas. Es un flujo constante de fenómenos pasajeros reemplazados por otros fenómenos. Es el *processus* jurídico que se realiza con la fatalidad lógica de una cosa viva, poniendo en circulación lo engendrado.'

"Si tal es el derecho, si su vida es *constante hacerse,* ¿por qué hemos de resistirnos a ver que la noción misma de obligación se cambie, abandonándose o modificándose, cuando menos, el concepto que de ella se tuvo durante siglos? A nuevas necesidades, conceptos nuevos.

"La idea de obligación como engendro exclusivo de un acuerdo de voluntades, es la máxima exaltación del individualismo. Decir que mi promesa, libre y espontáneamente formulada, no tiene fuerza obligatoria hasta que otra persona no la acepte ¿no es prescindir del medio social en que actúa el promitente y hacer caso omiso de todos aquellos que, con derecho, pudieron confiar en ella?

"Lanzada una propuesta en el medio social—ha apuntado con agudo criterio Demogue—, los destinatarios determinados o indeterminados, al tomar conocimiento de ella, obran en su consecuencia, se fían a la propuesta hecha. Hay un verdadero interés en decir que debe, en lo sucesivo, ser mantenida. De otra manera se causaría daño. Si se me promete una operación ventajosa, pronto voy a rechazar las otras propuestas menos favorables que se me formulan.

"Es por esta razón y en la medida que el interés social lo exige, que estimamos necesario reconocer fuerza obligatoria a la declaración unilateral de voluntad, tal como lo aconseja la doctrina más moderna y lo han aceptado los códigos que en ella se inspiran. La forma y medida con que debe realizarse su consagración en la ley, es problema de técnica legislativa, reservada a la sagacidad del legislador. Lo que importa es su incorporación al derecho positivo, y esto parece ser en la actualidad un problema superado."

([13]) El Código Civil mejicano, que se reputa como el que con mayor amplitud la ha aceptado, además de las disposiciones especiales con que las regula, en su Art. 1859 preceptúa: "Las disposiciones legales sobre contratos serán aplicables a todos los convenios y a otros actos jurídicos en lo que se opongan a la naturaleza de éste (se refiere al Código) o a disposiciones especiales de la ley sobre los mismos."

sonas—, (2) la de recompensa, (3) la oferta pública y (4) la estipulación en favor de tercero.

Nuestro Código Civil, en su Art. 1209, concede fuerza vinculante a la estipulación en favor de un tercero, pero con la condición de que éste "hubiese hecho saber su aceptación al obligado antes de que haya sido aquélla revocada." En estos casos al aceptarse la estipulación y notificarse al obligado se entra en un convenio y se convierte al tercero en parte contratante respecto a la estipulación que lo beneficia. Si aunque la acepte, deja de hacer saber su aceptación al obligado en el modo que fija dicho artículo, perderá su derecho a exigir su cumplimiento. Así lo decidimos en *Gelabert v. Sánchez*, 26 D.P.R. 654, 657 (1918).

En el área de los derechos reales es jurídicamente posible que algunos de ellos, como la servidumbre predial (Art. 472, Código Civil), el usufructo (Art. 397), el uso y habitación (Arts. 451, 452 y 453) y la hipoteca (Art. 1756, último párrafo, C. Civil y Arts. 116 y 138 de la Ley Hipotecaria) puedan constituirse por acto unilateral. Aunque concedido por ley, el derecho a la reparación de los daños causados nace al realizarse la acción culposa o la omisión negligente, sin necesidad del conocimiento o consentimiento del perjudicado. En el derecho sucesorio vemos que la sucesión se defiere "por la voluntad del hombre manifestada en testamento, y a falta de éste, por disposición de la ley, que el testamento es un acto personalísimo, que lo que aparezca claramente que fue la voluntad o intención del testador prevalece sobre las palabras del testamento y que, en ciertos casos, aun cuando se revoque el testamento, éste no pierde su fuerza legal. —Arts. 604 y sgts. En el Derecho mercantil encontramos los documentos negociables al portador, válidos sin necesidad de la voluntad concordada entre el librador u obligado y el tenedor o acreedor, y, como dice Garrigues en su citada obra, "la realidad del tráfico nos muestra que no es el contrato la única fuente de obligación; lo es también la declaración de vo-

luntad unilateral que surte efectos jurídicos en algunos casos." ([14])

■ Nada impide en nuestro ordenamiento jurídico, siempre que no sea contrario a la ley, a la moral, ni al orden público, que una persona, con capacidad plena para obrar y en ánimo de obligarse por su propio convencimiento y resolución firme, pueda quedar en derecho vinculada, sólo mediante su indubitada declaración de voluntad unilateral, a dar, hacer o no hacer alguna cosa posible en favor de otra persona.

Desde luego, tratándose de una obligación simple, sin causa típica, sin condición, contrapartida o contraprestación que la compense, a veces de pura beneficencia, puede resultar excesivamente oneroso para el promitente su cumplimiento. La obligación debe derivarse de un acto jurídico idóneo para producirla. ([15]) No debe existir incertidumbre ni en la forma en que se expresa la declaración ni en su sustancia o contenido.

■ Las disposiciones de nuestro Código Civil sobre obligaciones y contratos, bien las generales o bien las especiales, según la naturaleza de la declaración unilateral resulte de los hechos y eventos concurrentes en cada caso, deben ser aplicadas u observadas, al determinarse su existencia, validez y eficacia. Así, cuando deba cumplirse dentro de un plazo y éste no se ha señalado, pueden los tribunales señalarlos, de acuerdo con el Art. 1081 de nuestro Código Civil, o cuando se trata de una obligación que resulta excesiva o rigurosa en extremo, que se asemeje a una penalidad, pueden

([14]) Afirma Giorgi, en su clásica obra *"Teoría de las Obligaciones"*, tomo 3, pág. 29, 7ma. ed. Trad. por la Revista General de Legislación y Jurisprudencia, (1929): "Ha sido innato el sentido de la lealtad en la palabra e instintiva la tendencia imperiosa de confiar en las promesas."

([15]) La mera expresión o anuncio de un propósito o deseo no es suficiente para generar un derecho exigible. No debe consistir de un simple ofrecimiento de cumplir un deber de puro orden moral o social, sin efectos coercitivos e incapaz para crear una relación civil obligatoria, y cuyo incumplimiento, como dice don Jacinto Texidor, "tiene su sanción en el santuario de la propia conciencia y, a lo más, en la esfera social."

modificarla equitativamente (ver su Art. 1106) o reducirla "en lo que excediere de los usos de un buen padre de familia", como dice el Art. 1701, respecto a la responsabilidad civil en juego o apuesta no prohibidos.

■ Una vez ligado firmemente el promitente a hacer buena su promesa, debe cumplirla al tenor de la misma, quedando sujeto, desde luego, en caso de proceder a su cumplimiento con dolo, negligencia o morosidad, o de contravenirla de cualquier modo, a la indemnización de los daños y perjuicios causados, con arreglo a lo dispuesto en el Art. 1054 de nuestro Código Civil, que se refiere a toda clase de obligaciones cualquiera que sea su origen.[16]

A la luz de todo lo expuesto hasta aquí respecto a la eficacia vinculante de la declaración de voluntad unilateral, consideremos en seguida si el fallo contra Rosendo Gautier estuvo jurídicamente bien fundado.

Se demanda a éste por una alegada culpa aquiliana; se le condena por "su obligación contractual." A juicio nuestro ni por la primera, ni por la segunda razón, podía exigírsele responsabilidad a Rosendo Gautier.

■ Descartamos seguidamente la imputada culpa aquiliana porque no fue presentada evidencia alguna directa o indirecta, sobre la alegación de la demanda que expuso que "Al momento del accidente actuaba el demandado Eliezer Gautier Benítez como agente o empleado del demandado Rosendo Gautier y en ocasión de su empleo." Con claridad

---

[16] Dentro de nuestro ordenamiento privado, generalmente, cualquier hecho del hombre, al ser causa del daño, obliga a su ejecutor a repararlo. Por eso nunca nos hemos sentido amarrados al arcaico concepto de que no hay más responsabilidad fuera de la que nace del contrato o de la culpa.

En estos casos los tribunales deberían sentirse en libertad de sancionar al promitente que ha violado de mala fe su promesa, a falta de otras sanciones fijadas taxativamente por ley, bien obligándole a cumplir en forma específica lo prometido o bien imponiéndole solamente la obligación de resarcir los daños resultantes de la confianza depositada en la declaración, según las circunstancias concurrentes lo aconsejaran.

evidente quedó demostrado en el juicio que, en el momento del accidente, (a) Eliezer conducía un automóvil de su propiedad;(¹⁷)  (b) que iba de regreso hacia su hogar;  (c) que ya había terminado su jornada de trabajo con su hermano, y (d) que no realizaba acto alguno en beneficio o interés o por órdenes de su hermano Rosendo, ni con motivo o en ocasión de su empleo con éste.

Obligación contractual jamás quedó acreditada.  Para que exista el contrato deben concurrir los esenciales requisitos del consentimiento de los contratantes, objeto cierto que sea materia del contrato y causa de la obligación que se establezca. —Art. 1213. —Jamás hubo un acuerdo o convenio alguno entre Rosendo y el demandante por el cual aquél se obligara, por causa suficiente, a resarcir los daños y perjuicios atribuibles en derecho únicamente a Eliezer.  De la propia prueba del demandante surge que cuando su hermano le explicó "lo que había hablado el señor", el demandante "no dijo nada." (¹⁸)

La ausencia de una obligación contractual la acepta el propio demandante–recurrido, en su alegato.(¹⁹)

Jamás se pidió a Rosendo Gautier que cumpliera su llamada obligación contractual de indemnizar.  La demanda, presentada varios meses después de hacerse la supuesta promesa, no se fundó en tal obligación contractual.  Desde el

---

(¹⁷) Fue un error del tribunal de instancia considerar "vehículo comercial" al automóvil de Eliezer.  De conformidad con el Art. 2(e) y (g) de la Ley Núm. 279 de 1946 era un "automóvil de servicio privado."  Nótese que en la definición de "vehículo comercial" contenida en la Sec. 1–149 de la Ley Núm. 141 de 1960, según enmendada por la Núm. 91 de 1961, el "station wagon" fue taxativamente excluido.

(¹⁸) Después se dijo, pero en forma de opinión, por el hermano del demandante que "El lo aceptó el dicho."

(¹⁹) Se dice a la página 9 de ese alegato:

"El hecho de que el Tribunal dijese en su sentencia, como dijo ('Rosendo se obligó voluntaria y válidamente a indemnizar al demandante.  Eso de por sí, basta') no quiere decir que haya surgido una relación contractual, como tal parece pretende el recurrente.  Una situación parecida surgió en el caso de *Ramos de Anayas* v. *López*, 36 D.P.R. 501: 'y hubo también la manifestación hecha por el demandado

inicio de la acción hasta la celebración del juicio transcurrieron cinco años durante los cuales a ninguno de los cuatro competentes abogados del demandante se le ocurrió enmendar la demanda a los fines de fundarla en una "obligación contractual" respecto a Rosendo Gautier Benítez. Es más, cuando al día siguiente de haber donado Rosendo la suma de $20.00 para comprar sangre, se necesitó otro litro de sangre, su importe no se lo piden a Rosendo, pero sí a otra persona llamada "Blas Benítez."

Tenemos pues, que la conducta del demandante y su hermano con posterioridad a la supuesta asunción de la "obligación contractual", no está a tono con la firmeza, certidumbre y existencia de la misma. Ninguna confianza depositaron en las manifestaciones que hiciera Rosendo Gautier. Como resultado de ellas ningún daño, perjuicio o mal sufrió el demandante. Las diferentes formas de reproducir las expresiones de Rosendo Gautier hechas en el momento en que cumple su cristiano deber de donar $20.00 para la compra de un litro de sangre; la ausencia del testimonio de Visitación Sáez, empleado público de quien se dijo estuvo presente en ese momento, el motivo único que llevó al hermano del demandante, adonde el padre de Eliezer, primeramente, y después a la residencia de Rosendo, no son circunstancias persuasivas para entender que existió en éste el ánimo o la intención de obligarse ilimitada e incondicionalmente, respecto a una grave responsabilidad solidaria sin culpa o sin deuda substantiva correspondiente.

Las tres motivaciones "por las cuales Rosendo se obligó" que se le ocurrieron al juez sentenciador, constituyen un

mismo, según declaró uno de los demandantes, de que él, el demandado, si se le probaba que el peón estaba guiando el camión, estaría dispuesto a pagarle los gastos a los demandantes.

"El apelante dice que si los demandantes confiaron en esta manifestación suya, la acción debió fundarse en un contrato. No vemos contrato alguno en la manifestación de Heraclio López. Los demandantes usaban esta manifestación como tendente a demostrar que el camión era guiado por un peón y que tal peón era empleado del demandado."

juego de hipótesis e inferencias que no encuentran base en la prueba. Ésta, por el contrario, es más favorable a la formación de esas hipótesis e inferencias en sus formas negativas.

El conjunto de las alegaciones y la evidencia indican que tales manifestaciones de Rosendo Gautier se ofrecieron por la parte actora con el exclusivo fin de probar la alegada relación de patrono y empleado entre los hermanos Gautier, sin estimar que ellas por sí solas bastaban para responsabilizarlo por el daño atribuible a Eliezer, ni mucho menos esperar que pudieran configurar en la mente del tribunal a quo una "obligación contractual." [20]

Del récord se desprende que el juzgador estaba consciente del verdadero propósito de la parte demandante al ofrecer evidencia sobre manifestaciones de Rosendo Gautier. A pesar de haberlas admitido como evidencia, el juez no determinó que el automóvil privado que lesionó al demandante fuera de la propiedad de Rosendo Gautier, ni que se sirviera del mismo para los fines de su empresa, ni que Eliezer al ocurrir el accidente estuviese actuando como empleado de él. Para probar tales extremos fueron inútiles e inefectivas las llamadas admisiones contra interés de Rosendo Gautier. La situación de hechos en el caso de *Guzmán* v. *Ortiz*, 39 D.P.R. 184 (1929) es muy distinta a la del presente.

*Considerando todas las circunstancias concurrentes, esas manifestaciones eran insuficientes para dejar establecida una obligación unilateral vinculante y, mucho menos, una obligación contractual. El dar o atribuir a esas manifestaciones, (aceptando, desde luego, que las mismas se hicieron) un alcance legal o consecuencia jurídica que no podían tener o*

---

[20] En su alegato, pág. 9, se expresa así el demandante recurrido:

"Como se verá, en dicho caso al igual que éste, las manifestaciones del demandado fueron admitidas y consideradas por el Tribunal a los efectos de determinar la relación entre el conductor del vehículo y el demandado. Mal puede invocar el recurrente de que esto constituye una nueva causa de acción distinta surgida de un supuesto contrato."

*surtir, y condenar al codemandado a reparar un daño que no causó, es un grave error que amerita la revocación del fallo respecto al codemandado Rosendo Gautier Benítez.*[21]

---

[21] Bajo los hechos envueltos en este recurso y en vista de nuestras conclusiones finales, creemos innecesario tratar la cuestión de si deben considerarse enmendadas las alegaciones a fin de conformarlas a la prueba, de acuerdo a la Regla 13.2, ni la aplicación de la Regla 44.3.