MIGUEL ROSA VALENTÍN y CARMEN VALENTÍN VDA. DE ROSA, demandantes y recurrentes, *v.* LUIS VÁZQUEZ LOZADA, ETC., demandados y recurridos.

*Número:* R-73-40      *Resuelto:* 12 de mayo de 1975

*Fabián Pabellón Ramos,* abogado de los recurrentes; *Félix A. Ramos Cabán,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Mediante un contrato de opción de compra los recurridos prometieron vender a los recurrentes, en determinado plazo y bajo las condiciones allí estipuladas, dos fincas por un solo precio alzado, sin asignarse a cada una su parte del precio, y dando en el contrato los linderos de cada una y sus respectivas cabidas. Antes del vencimiento del plazo las fincas fueron mensuradas y se descubrió que la cabida total de ambas era mucho menor que la consignada en el contrato. ¿Tendrían derecho los optantes y potenciales compradores a una rebaja en el precio en proporción a la disminución en la cabida? Tratándose de un contrato de opción, en el supuesto de que hubiese sido aceptada dentro del plazo, ¿quedó perfeccionado con ello un contrato de compraventa? ¿Cuál es la naturaleza del contrato de opción? Tales son las interrogantes que aquí se nos plantean. Antes de pasar a considerarlas, veamos en algún detalle los hechos.

El 22 de abril de 1970 don Luis Vázquez Lozada y su

esposa, de una parte, a quienes nos referiremos como los promitentes, y don Miguel Rosa Valentín y doña Carmen Valentín viuda de Rosa, de otra parte, a quienes se aludirá como los optantes, suscribieron un documento que autenticaron ante notario y que titularon "Contrato de opción de compraventa de fincas rústicas." Se hizo constar que los promitentes eran dueños de dos fincas designadas "A" y "B", que allí se describieron dando sus respectivos linderos y cabidas de 32.85 cuerdas a la finca "A" y 5.268 cuerdas a la finca "B". Los promitentes se comprometieron a vender las dos fincas a los optantes por $38,000 en un plazo de seis meses, con derecho éstos a una prórroga de seis meses adicionales, estipulándose lo siguiente:

"CUARTA: Esta opción se concede en consideración al precio de DOS MIL DOLARES ($2,000.00) que los vendedores reciben en este acto de manos de los compradores y por lo que le otorgan formal carta de pago y es entendido que de no verificarse la venta en el plazo convenido de seis meses y de la prórroga de seis meses más, por no decidirse a formalizarlos [sic] los compradores; los vendedores retendrán para su beneficio de los DOS MIL DOLARES ($2,000.00) importe de esta opción y de verificarse la venta en el tiempo estipulado, entonces los DOS MIL DOLARES ($2,000.00) se descontarán del precio de venta de las dos fincas."

Varios meses después de otorgado el documento los promitentes practicaron una mensura de ambas fincas que reveló que la finca "A" tenía una cabida de sólo 18.7945 cuerdas, y la finca "B" una cabida de 5.202 cuerdas. La cabida total de las dos fincas según el contrato era de 38.118 cuerdas y según la mensura de 23.9965 cuerdas; una diferencia considerable. Notificaron esta situación a los optantes y les expresaron su disposición de devolverles los $2,000, a menos que éstos estuviesen dispuestos a pagar los $38,000 por las fincas. Los optantes no estuvieron conformes y por su parte exigieron, todavía dentro del plazo concedídoles en el contrato, que se rebajara el precio acordado de $38,000 en proporción a la disminución en la cabida de las fincas. No se pusieron de acuerdo y

la controversia trascendió al ámbito judicial cuando los optantes presentaron demanda contra los promitentes en que exigieron el cumplimiento específico del contrato y reclamaron $25,000 de indemnización por daños que alegaron haber sufrido debido a su negativa a venderles las fincas. Los demandados contestaron la demanda y alegaron estar dispuestos a vender a los demandantes, por el precio convenido en el contrato, el terreno comprendido dentro de los linderos allí expresados; aceptaron "que las fincas no tienen la cabida que . . . de buena fe creyeron tenían," aduciendo que se percataron de ello al mensurar las fincas después de suscrito el contrato, de lo cual habían informado a los demandantes en enero de 1971. Reiteraron mediante oferta de sentencia su disposición de vender las fincas por el precio alzado de $38,000, o resolver el contrato y devolver a los demandantes los $2,000 que recibieron de ellos más intereses legales sobre dicha cantidad.

En una bien elaborada sentencia el Tribunal Superior declaró sin lugar la demanda y decretó la resolución del contrato de 22 de abril de 1970. Condenó a los demandados a devolver a los demandantes los $2,000, más intereses legales, e impuso a los demandantes el pago de las costas y $500 de honorarios de abogado. Expedimos auto de revisión a solicitud de los demandantes.

El ilustrado juez sentenciador partió acertadamente de la base de que las partes otorgaron un contrato de opción el 22 de abril de 1970. Como veremos más adelante lo acordado es un típico contrato de opción de compra. No obstante, en su razonamiento, el juez sentenciador concluyó que a dicho contrato le son aplicables las reglas de la compraventa y en su virtud resolvió el caso a base del Art. 1360 del Código Civil, 31 L.P.R.A. sec. 3820, precepto que rige específicamente para el contrato de compraventa de cuerpos ciertos. Aunque concluimos al igual que el tribunal de instancia que la demanda de los optantes era improcedente, es preciso que señale-

mos la norma jurídica que sobre el particular debe prevalecer en nuestra jurisdicción.

Veamos primero el Art. 1360, 31 L.P.R.A. sec. 3820, que dice así:

"En la venta de un inmueble, hecha por precio alzado y no a razón de un tanto por unidad de medida o número, no tendrá lugar el aumento o disminución del mismo, aunque resulte mayor o menor cabida o número de los expresados en el contrato.

Esto mismo tendrá lugar cuando sean dos o más fincas las vendidas por un solo precio; pero si además de expresarse los linderos, indispensables en toda enajenación de inmuebles, se designaren en el contrato su cabida o número, el vendedor estará obligado a entregar todo lo que se comprenda dentro de los mismos linderos, aun cuando exceda de la cabida o número expresados en el contrato; y si no pudiere, sufrirá una disminución en el precio proporcional a lo que falte de cabida o número, a no ser que el contrato quede anulado por no conformarse el comprador con que se deje de entregar lo que se estipuló."

La controversia, de ser aplicable a este caso el transcrito artículo, tendría que resolverse con vista de su segundo párrafo. Aquí se trata de dos fincas y un solo precio, situación poco corriente en la práctica, y novel en cuanto a la jurisprudencia de este Tribunal respecta. El tribunal de instancia adoptó el criterio del comentarista Manresa—*Comentarios al Código Civil Español*, tomo X, volumen I, sexta edición revisada, Madrid, 1969—en el sentido de que el comprador no tiene derecho a una disminución proporcional en el precio si se le entrega "todo el terreno comprendido dentro de los linderos asignados a la finca." (Obra citada, pág. 252.) Manresa señala que la disminución en el precio tendría lugar a elección del comprador cuando el vendedor no puede entregarle algo que está comprendido dentro de la finca pero que no es suyo, señalando como ejemplos, "una parte, un edificio, un valle, varios medianiles, una cañada, etc." En ese caso, añade Manresa, "la venta a cuerpo cierto queda desnaturalizada, ya no se vende lo convenido, y es justa y lógica la solución que da

el artículo: o se anula el contrato, o se rebaja el precio proporcional." (Obra citada, pág. 253.)

La expresión literal del precepto citado no parece ajustarse a la interpretación que da Manresa. Otros comentaristas—Federico Puig Peña, *Compendio de Derecho Civil Español*, tomo III, volumen I, Barcelona, 1966, pág. 590; y Borrell y Soler, *Derecho Civil Español*, tomo tercero, Barcelona 1955, pág. 339—se limitan a una exposición literalista, sin tomar bandos en cuanto a su interpretación.

Scaevola, por su parte—*Código Civil*, tomo XXIII, vol. II, Madrid, 1970, pág. 88 y siguientes—hace una extensa exégesis del segundo párrafo del artículo que comentamos y dice finalmente:

"Lo que la frase *y si no pudiere* significa, a nuestro juicio, es que si por comprenderse dentro de los lindes menor cabida de la expresada en el contrato al vendedor no le fuere posible cumplir éste según su tenor literal, deberá sufrir, o los efectos de la anulación, o una rebaja en el precio proporcional a lo que faltase de cabida o número." (Obra citada, pág. 91.)

Puig Brutau—*Fundamentos de Derecho Civil*, tomo II, volumen II, Barcelona, 1956—coincide con Scaevola y dice:

"Por tanto, en las ventas por precio alzado hay que entregar la cosa cierta que es la finca individualizada mediante la descripción de sus linderos. Todo lo comprendido dentro de los mismos ha de ser entregado a cambio del precio convenido. En este sentido, la circunstancia de que, además, se haya hecho constar en el contrato la cabida o número no puede repercutir en un aumento de precio a pesar de que la cabida contenida dentro de los linderos sea superior a la que se hizo constar en el contrato; *pero, en cambio, puede ser un elemento, dicha expresión de la cabida o número, para la disminución del precio convenido si el vendedor no puede entregar todo lo comprendido dentro de los linderos de la finca vendida por precio alzado.* El comprador puede en este caso, desistir del contrato por no resultar posible la entrega de la cosa en su integridad, o admitirla a cambio de rebajar del precio una cantidad que sea pro-

porcional a lo que falte de cabida o número." (Obra citada, págs. 175–176, énfasis nuestro.)

Diego Espín—*Manual de Derecho Civil Español*, vol. III, Madrid, 1961, pág. 500—parece también coincidir en esta interpretación cuando señala que ". . . en la venta a precio alzado, siendo fundamental la entrega de todo lo incluido en el perímetro delimitado, dará lugar la falta de alguna parcela a una disminución en el precio, proporcional a lo que falte, no porque exista en ese supuesto la correlación entre cabida y precio, sino porque hay que resarcir al comprador de una parte cierta de la finca comprada."

Manresa señala que esta solución sería injusta para el vendedor, que perdería el valor del exceso en la cabida cuando ese fuere el caso, y perdería también al rebajársele proporcionalmente el precio si la cabida fuere menos que la expresada en el contrato. Pero no podemos perder de vista dos cosas: primero, que el error al expresarse la cabida en el contrato no debe favorecer al vendedor, que es el dueño, y que por tanto es de presumirse que esté al tanto de lo que tiene; y, segundo, que estamos frente a un caso de dos fincas vendidas por un solo precio alzado, y no de una. Si el legislador hubiese querido tratar el caso de dos o más fincas como si se tratase de una, fácil le hubiese sido evitar la confusión si hubiese incorporado la primera frase del segundo párrafo al primer párrafo y allí puesto un punto. El artículo diría:

"En la venta de un inmueble, hecha por precio alzado y no a razón de un tanto por unidad de medida o número, no tendrá lugar el aumento o disminución del mismo, aunque resulte mayor o menor cabida o número de los expresados en el contrato. Esto mismo tendrá lugar cuando sean dos o más fincas las vendidas por un solo precio."

Esa no es, sin embargo, la redacción del Art. 1360 que comentamos. Y es que cuando se venden dos o más fincas por un solo precio con expresión de los linderos y la cabida de cada una tenemos, como dice Scaevola, un caso mixto: "de un lado

el precio único, indicando el rasgo estructural aleatorio de las enajenaciones a cuerpo cierto; de otro la idea de la mensura, imponiéndose como un reflejo de la voluntad del comprador, que no fue la de adquirir por el contorno, sino por la medida." (Obra citada, pág. 90.) Esta solución es sin duda más equitativa y está más a tono con las circunstancias atinentes a nuestra problemática: una isla con mucha gente y poca tierra. Los moldes rigurosos del Art. 1360 representan un anacronismo en nuestro tiempo, que queda superado, en cuanto a la venta de dos o más fincas se refiere, por la interpretación de Scaevola, que adoptamos.

■ Si aplicáramos esta interpretación a los hechos ante nos, se impondría como solución la revocación de la sentencia del tribunal a quo. Vendrían obligados los vendedores a hacer una reducción en el precio proporcional a la diferencia entre la cabida de las fincas expresada en el contrato y la que resultó de su mensura. Empero, tal solución no es aquí aplicable porque entre demandantes y demandados no existe, ni ha existido conforme a los hechos, un contrato de compraventa. Aquí se trata de un contrato de opción para el que rigen, no las disposiciones sobre la compraventa, sino las que rigen las obligaciones y contratos en general.

"El derecho de opción"—dicen Rosell y Mentha[1]—"responde a las necesidades de nuestra época, embriagada de industria y de especulación." Ossorio y Gallardo[2] añade: "y es que, como advierte nuestro ilustre Castán en su magnífico ensayo *Hacia un nuevo Derecho Civil*, 'a la antigua concepción estática del Derecho emanado de la Ley o, mejor dicho, de la voluntad del legislador, sustituye hoy una nueva concepción, basada no sobre la exégesis racional de los Códigos, sino sobre el orden jurídico que nace espontáneo, flúido, flexible, de la

---

[1] *Manuel de Droit civil suisse*, por Virgile Rossell y F. H. Mentha, 2da. ed., tomo II, citado por Ossorio y Gallardo, *El Contrato de Opción*, segunda edición, Madrid, 1935, pág. 33.

[2] *Op. cit.* nota 1, *supra*, pág. 33.

vida en movimiento, tal como es presenciada y comprendida no sólo por el legislador, sino por los jurisconsultos, y sobre todo por los magistrados.' "

¿Qué es el contrato de opción y cuáles son sus efectos jurídicos? El Código Civil no lo reglamenta. De ahí que haya disparidad de criterios doctrinales y jurisprudenciales de que nuestra propia jurisprudencia no es excepción. Dice don Eduardo Vázquez Bote en su obra *Derecho Civil de Puerto Rico*, tomo III, vol. 1, ed. 1973, pág. 534:

"Es ampliamente discutida la naturaleza jurídica de esta figura, no solamente en orden a considerarla como una mera cláusula, un precontrato, sino también en punto a si tiene carácter personal o real."

Más adelante añade este autor:

"La jurisprudencia puertorriqueña, aunque se ha preocupado reiteradas veces de la opción, no parece mantener una concepción uniforme del mismo, principalmente al atribuirle efectos dispares, que en ocasiones la aproximan al precontrato [aquí cita *Collazo* v. *Conesa,* 70 D.P.R. 155, 1949], a la promesa de compra y venta [vuelve a citar a *Collazo* v. *Conesa*] o la configuran como figura especial [cita *Pérez* v. *Sampedro,* 86 D.P.R. 526, 1962], disparidad de criterios que dificultan perfilar el instituto."

Ciertamente, en esto hemos caminado con pasos vacilantes, tanto como lo ha hecho el Tribunal Supremo de España, que en sentencia de 1 de julio de 1950 rompe una clara línea jurisprudencial iniciada con la sentencia de 11 de noviembre de 1943, a la que regresa en la de 13 de febrero de 1953, creando con ello no poca confusión respecto del efecto jurídico de la promesa de comprar y vender aceptada. Véanse, sobre el particular, Enneccerus, *Tratado de Derecho Civil*, tomo II (1966), págs. 43 y 44; Castán, *Derecho Civil Español, Común y Foral*, tomo IV (1952), pág. 39. Ante esta situación, por ser innominado en el Código el contrato de opción, no estamos obligados por reglas de hermenéutica que nos sitúen bajo la égida de la jurisprudencia española. En ausencia de disposición esta-

tutaria, (³) estamos en libertad de adoptar nuestras propias normas.

■ El contrato de opción ha sido definido de diferentes maneras. Ossorio, *op. cit.*, pág. 105 y pág. 111, dice que "es un contrato por virtud del cual el propietario de una cosa o derecho concede a otra persona, por tiempo fijo y en determinadas condiciones, la facultad exclusiva de adquirirlo o de transferirlo a un tercero, obligándose a mantener, mientras tanto, lo ofrecido a su disposición en las condiciones pactadas." Castán, *op. cit.*, pág. 41, lo define como "un convenio por el cual una parte concede a la otra, por tiempo fijo y en determinadas condiciones, la facultad, que se deja exclusivamente a su arbitrio, de decidir respecto a la celebración de un contrato principal." José María Mengual, *La Opción como Derecho y como Contrato*, estudio publicado en la Revista de Legislación y Jurisprudencia, tomo 168 (1936), pág. 129, dice que "la opción en su sentido estricto, implica 'un contrato bilateral y consensual, por virtud del cual una o varias personas conceden a otra u otras la facultad exclusiva de ejercitar uno o varios hechos o uno o varios derechos por su propia cuenta y con el mutuo y recíproco beneficio para ambas partes, dentro de un período de tiempo convenido.' "

Estas tres definiciones resumen a nuestro juicio los pensamientos de los comentaristas y la jurisprudencia sobre el contrato de opción y sus diferentes enfoques de esta figura jurídica. Las diferencias esenciales saltan a la vista. Ossorio y Mengual lo consideran un contrato con individualidad y substantividad propias, mientras que Castán lo considera un contrato preparatorio o precontrato, que se celebra con miras a un contrato principal. Para Ossorio y para Castán es un contrato unilateral. Para Mengual es bilateral. Todos están de

---

(³) La Ley Núm. 130 de 13 de junio de 1967, en su Art. 10, 17 L.P.R.A. sec. 510, reglamenta ciertos contratos de opción, pero se refiere al caso específico de construcción de viviendas, y no al contrato de opción en general.

acuerdo en que es un contrato sujeto a un término o plazo fijo, en que el titular del derecho objeto del contrato, a quien llamaremos promitente o concedente, queda obligado frente a otra persona, que llamaremos el optante, a hacerle reserva exclusiva del derecho que es objeto de la opción.

■ Nos inclinamos con Ossorio y con Castán a favor de la tesis de que la opción es un contrato unilateral. Mengual defiende su tesis de bilateralidad a base de que, según sostiene, el optante "tiene la obligación de elegir una situación jurídica entre las varias ofrecidas dentro del plazo al efecto marcado." Convenimos con Ossorio en que el optante no está obligado a nada, que tiene "libertad absoluta para tomar o no tomar la cosa ofrecida." Lo determinante de la bilateralidad de un contrato es que haya obligaciones recíprocas entre los contratantes. En todo contrato hay más de una parte. No puede haber un contrato sin que haya unión de voluntades. Una sola persona no puede contratar consigo misma. Cuando, como en el contrato de opción, dos personas se ponen de acuerdo pero sólo una de ellas resulta obligada, el contrato es unilateral. A este efecto, véanse, además, Puig Peña, *Tratado de Derecho Civil Español*, tomo IV, vol. II, Madrid, 1951, pág. 512; Ramón Badenes Gasset, *La Preferencia Adquisitiva en el Derecho Español* (Ed. Bosch, Barcelona, 1958), pág. 218; y las sentencias de 10 de julio de 1946 y de 18 de enero de 1947 del Tribunal Supremo de España.

■ Respecto de si el contrato de opción es un contrato autónomo con individualidad propia, o un contrato preparatorio o precontrato, nos inclinamos a favor de esta última solución, tesis que predomina en la doctrina española —Castán, *op. cit.*, págs. 41–42; y que adoptamos en *Collazo* v. *Conesa*, supra. Aceptamos la definición del contrato de opción que da Castán, antes transcrita, cuyos requisitos esenciales son: "1ro. Concesión por una parte a la otra de la facultad de decidir sobre la celebración o no del contrato principal, sin obligación alguna de ésta (la prima, en su caso, es elemento

accidental). 2. Concesión de modo exclusivo. 3. Por plazo cierto. 4. Sin otra condición que el propio juicio del optante."

Y añade: "Los caracteres que lo distinguen son: ser un contrato preparatorio (una modalidad de la promesa de vínculo unilateral), aunque este punto es discutido; consensual, y generalmente unilateral, aunque pasa a ser bilateral cuando se fija una prima que ha de pagar el titular del derecho de opción al concedente del mismo." Sobre su carácter preparatorio o modalidad de la promesa de vínculo unilateral aclara lo siguiente el citado autor en nota al pie de página:

"No faltan autores que consideran la opción, no como un precontrato o contrato preparatorio, sino como un contrato completo e independiente, es decir, un negocio de tipo contractual neto, que llena de por sí una función actual y definitiva. Otros, como Roca (*El contrato de opción*, en Estudios de Derecho privado, pág. 351 y sigtes.), seguido por Mezquita (*El pacto de opción*, en Revista Crítica de Derecho Inmobiliario, 1951, pág. 84), dicen que, en buena técnica, lo que se denomina contrato de opción no es más que un simple pacto de cláusula de opción, acoplada a un contrato perfecto o a un contrato de promesa o precontrato.

"Ossorio y Gallardo, autor de una de las monografías iniciales y muy original sobre el asunto, defiende la individualidad jurídica de este contrato. Pero no sin razón se le ha objetado que más bien que contrato de contorno y configuración propia es el de opción ni más ni menos que una variedad del de promesa o contrato preparatorio.

"Véanse sobre este punto Valverde, *Tratado*, 4ta. ed., pág. 353, nota; Gayoso, *Cuestiones sobre el contrato de compraventa*, en la Revista de Derecho Privado, 1927, pág. 202 y sigtes., y De Castro, *La promesa de contrato*, en el Anuario de Derecho Civil, 1950, pág. 1.163 y sigtes."

Dice José Sánchez Fontáns, catedrático que fue de la Universidad de Montevideo y una de las más destacadas figuras entre los civilistas de Hispanoamérica—*Naturaleza de la*

*Opción*, estudio publicado en la Revista de Derecho Español y Americano, Año XII, II, época, Madrid, 1967, pág. 76—

"La promesa de contratar—denominada por los italianos *contrato preliminar* y por los españoles *precontrato*—es bilateral cuando impone a ambas partes la obligación de celebrar el contrato definitivo. La promesa unilateral, en cambio, genera obligación para una de las partes. Sólo existe un deudor y un acreedor. El beneficiario de la promesa tiene opción para decidir si exigirá o no a la contra parte la celebración del contrato definitivo.

De este modo, la declaración que implica el ejercicio de la opción transforma a la promesa unilateralmente vinculante en sinalagmática. A partir de ese momento cualquiera de las partes puede exigir el cumplimiento de las obligaciones recíprocas, obligaciones de hacer, que consisten en otorgar el contrato definitivo.

Por consiguiente, la opción no es más que la promesa unilateral de contratar, considerada desde el punto de vista del acreedor. A la promesa unilateral de venta corresponde una opción de compra, y recíprocamente."

Más adelante, en la página 78, señala:

"La identificación entre promesa unilateral y opción, aunque implica una confusión conceptual, tiene una consecuencia práctica estimable. Interpreta la voluntad de las partes que celebran la promesa unilateral como dirigida a constituir una oferta irrevocable de promesa bilateral de contratar, de tal modo que el ejercicio de la opción importa la aceptación de la oferta y, por consiguiente, perfecciona el contrato *preliminar* bilateral." (Énfasis suplido.)

Este efecto del ejercicio de la opción, que señala Sánchez Fontáns, aparece adoptado en la sentencia del Tribunal Supremo de España de 23 de marzo de 1945, que declaró "que el ejercicio del derecho de opción no impone al optante la obligación de poner el precio a disposición del concedente dentro del plazo de la opción, pues basta que en este tiempo manifieste su voluntad de llevar adelante el contrato de promesa, dado que el cumplimiento de las obligaciones derivadas de ésta hay

que referirlas después y no al tiempo fijado para la opción." (Castán, págs. 45–46.) Al mismo efecto, véase Puig Peña, obra citada, tomo IV, vol. II, págs. 514 y 515.

■ En resumen, la aceptación de la promesa de venta por el optante produce, no un contrato perfeccionado de compraventa, sino la obligación de parte del concedente de vender, y de parte del optante de comprar la cosa objeto del contrato. Lo dicho en *Pérez* v. *Sampedro*, 86 D.P.R. 526 (1962), en cuanto se interprete como que la aceptación por el optante de una promesa de venta, tiene el efecto de perfeccionar el contrato de compraventa, debe considerarse limitado a la luz de lo que aquí exponemos. Véase *Jordán-Rojas* v. *Padro-González*, resuelto en esta misma fecha, pág. 813.

■ El error de considerar la promesa bilateral de compraventa como un contrato de compraventa obedece a un hecho histórico. Así lo señala Ennecerus, citando la sentencia de 11 de noviembre de 1943: "la norma contenida en el art. 1.589 del Código francés (la promesa de venta equivale a la venta) fue reproducida en el art. 1.373 del proyecto español de 1851, pero no en el definitivo Código civil, que dio una nueva redacción del precepto (art. 1.451 [1340 nuestro, 31 L.P.R.A. sec. 3747]) abandonando aquel principio tajante." Más adelante concluye Ennecerus: "Conclusión: a falta de una norma tan explícita cual la indicada del Derecho francés, hay que aceptar en el nuestro, como la más racional y fundada, la concepción de la promesa bilateral de comprar y vender como un contrato preparatorio o 'precontrato' que tiene por objeto la futura celebración de un contrato de compraventa y cuyos efectos no pueden coincidir en absoluto con los de la venta actual y definitiva."

Al igual que en el contrato bilateral de promesa de venta, la aceptación por el optante de la promesa de vender héchale por el concedente implica para las partes no una obligación de dar, como en la compraventa, sino de hacer, de efectuar un

contrato de compraventa cuando lo exija cualquiera de los contratantes. Véase Enneccerus, pág. 41 y siguientes.

No hemos perdido de vista el Art. 1339 del Código Civil, 31 L.P.R.A. sec. 3746, que dice:

"La venta se perfeccionará entre comprador y vendedor, y será obligatoria para ambos, si hubieren convenido en la cosa objeto del contrato, y en el precio, aunque ni la una ni el otro se hayan entregado."

■ En vista de este artículo podría argüirse que con la aceptación de la promesa de venta, el optante ha prestado el consentimiento que falta para que quede perfeccionado el contrato de compraventa. El error de tal afirmación estriba en que esa disposición aplica al contrato de compraventa, pero no al contrato de opción, que siendo una modalidad del contrato de promesa de compraventa, está sujeto, no a las disposiciones de la compraventa y sí a las de las obligaciones y contratos en general. Conforme hemos señalado, la promesa de compraventa aceptada no perfecciona un contrato de compraventa según la tradición española, que es la nuestra. Distinto al Derecho civil francés, en que promesa de compraventa aceptada es tanto como compraventa, en el Derecho civil español— y en esto hay unanimidad de criterios—la promesa de compraventa aceptada no perfecciona el contrato de compraventa. Véase *Rossy* v. *Tribunal Superior*, 80 D.P.R. 729, 740 (1958).

En *Rossy*, supra, se nos ofrece un buen ejemplo de una promesa bilateral de compraventa. Allí, citando la sentencia de 11 de noviembre de 1943, en que fue ponente don José Castán Tobeñas, se dijo (pág. 742) : ". . . hay que aceptar la concepción de la promesa bilateral de comprar y vender como un contrato preparatorio . . . que tiene por objeto la futura celebración de una compraventa y cuyos efectos no pueden coincidir en absoluto con los de la venta actual y definitiva."

■ Es obvio que en la promesa bilateral de compraventa en *Rossy*, los contratantes prestaron su consentimiento para la celebración, cuando se cumpliera determinada condición,

de un contrato de compraventa sobre un objeto cierto, la mitad de una finca, y por un precio cierto, $1,000 que habían pagado los compradores mediante los servicios que prestaron, cuyo valor se estipuló en esa cantidad. Siendo la opción de compra un precontrato, cuya finalidad es, como en la promesa bilateral de compraventa, la celebración de un contrato principal (la compraventa), no vemos razón para que el consentimiento prestado por el optante al aceptar comprar tenga un efecto distinto. La aceptación por el optante tiene el efecto de hacer exigible la obligación del concedente de vender, y frente al concedente su obligación de comprar la cosa objeto del contrato, pero no el perfeccionamiento por ese solo hecho del contrato de compraventa.

Volviendo a la situación de hechos ante nos, el problema ha de resolverse partiendo de dos supuestos: primero, que la opción fue aceptada por los demandantes antes de vencerse el plazo; o, segundo, que no fue aceptada.

Veamos el primer caso. Los optantes (los demandantes) alegan que ellos aceptaron la opción. De ser así, no se perfeccionó, por las razones que hemos expresado, un contrato de compraventa, y por tanto no es de aplicación el Art. 1.360 del Código Civil, que es aplicable únicamente al contrato de compraventa. Debemos recurrir a las disposiciones generales sobre obligaciones y contratos, ya que el contrato de opción no está regulado en el Código. Castán, pág. 44.

▉▉▉▉ Ossorio, pág. 169, se plantea una situación parecida —la disminución en el valor de la cosa o cambio en su substancia—y concluye que la solución sería la nulidad del contrato basada en el error. En *Capó Caballero v. Ramos*, 83 D.P.R. 650 (1961), señalamos que el consentimiento dado por error vicia el contrato cuando el error es excusable, y sostuvimos que el error es excusable si versa sobre hechos desconocidos por la parte que lo invoca o que no hubiera podido conocer con un mediano cuidado. Aplicando esos criterios, no podríamos concluir que una diferencia tan grande en la cabida de las

fincas, casi un cuarenta por ciento de la consignada en el contrato, fuera un error que las partes no hubiesen podido conocer con un mediano cuidado. Hemos dicho "las partes" y no los concedentes (futuros vendedores) o los optantes (futuros compradores). La prueba no establece que esa condición fuera conocida de ninguno de ellos, y la buena fe de los concedentes y ahora demandados recurridos quedó probada a satisfacción del tribunal de instancia. Hubo por tanto error de ambas partes, que debe traducirse por ese hecho en error excusable. No hubo por tanto un consentimiento válido y procedía la anulación del contrato.

En el segundo supuesto, es decir, que los optantes no aceptaran la promesa de venta, ninguna obligación quedaría a los concedentes, ni siquiera la de devolver los $2,000 que por concepto de prima pagaron los optantes. Empero, los concedentes aceptaron devolver dichos $2,000 y sus intereses, así lo dispuso la sentencia del tribunal a quo, y de esa parte no se ha recurrido ante nos.

Aunque nuestros razonamientos son distintos de los del tribunal de instancia, *toda vez que el recurso se da contra la sentencia y no contra sus fundamentos, la misma será confirmada.*

Los Jueces Asociados Señores Torres Rigual, Díaz Cruz y Negrón García concurren en el resultado.