Joseph BURNETT, Plaintiff,

v.

LUQUILLO BEACH DEVELOPMENT
CO., INC., Defendant.

BURNAC MORTGAGE INVESTORS,
LTD. (formerly known as CNA Mort-
gage Investors, Ltd.), Plaintiff,

v.

LUQUILLO BEACH DEVELOPMENT
CO., INC., Defendant, Third-Party
Plaintiff and Counterclaimed,

v.

Ulpiano BARNES, Third-Party
Defendant,

and

Ulpiano Barnes, Federal Mortgage Corp.,
Zoltan Roth and Joseph Burnett, Addi-
tional Parties Counterclaimed.

BURNAC MORTGAGE INVESTORS,
LTD., Plaintiff,

v.

Ulpiano BARNES, Defendant.

Civ. Nos. 74–1146, 74–1147, 74–1148.

United States District Court,
D. Puerto Rico.

Jan. 12, 1978.

Philip E. Roberts, Woods & Woods, Hato Rey, P.R., for plaintiffs Joseph Burnett, Burnac Mortgage Investors, Ltd., and also for Federal Mortgage Corp. and Zoltan Roth.

Mario O. Garcia Quintero, Mayaguez, P.R., for Luquillo Beach Development Co., Inc.

Carlos G. Latimer, Ramirez, Segal & Latimer, San Juan, P.R., Jerome Murray, New York City, for Ulpiano Barnes.

## OPINION AND ORDER

TORRUELLA, District Judge.

These suits are the consequence of the Medusa-like dealings of diverse lenders, borrowers, brokers, partners and stockholders, several of which wore different hats at the same time. The subject matter of these manipulations concerns the financing by C.N.A. Mortgage Investors, Ltd.[1] (hereinafter referred to as "CNA") of a condominium complex in Luquillo, Puerto Rico on land owned[2] by Luquillo Beach Development Co., Inc., (hereinafter referred to as "Luquillo Beach").

The consolidated cases originally contained a litany of claims, counterclaims, third party complaints, etc., *ad nauseum*. By the time of trial these had been reduced to a workable level. (See our Opinion and Order of October 11, 1977). The remaining controversies can best be understood through a brief resumé of the pleadings as they presently remain.

In all three suits, Civil Numbers 74–1146, 1147 and 1148, the respective Plaintiffs are claiming either brokerage or financing fees arising from a financing commitment to Luquillo Beach. It is alleged that CNA was ready, willing and able to comply with this

---

1. Substituted in later stages of these suits by its successor BURNAC Mortgage Investors, Ltd.

2. Some of the land in question was owned by a subsidiary corporation, Luquillo Seaside Condominium. This inaccuracy is not of any substance to the present controversies.

commitment but that the closing did not take place by reason of Luquillo Beach's failure to produce essential supporting documents, a prerequisite to the closing.

In Civil Number 74–1146, Joseph Burnett (hereinafter called "Burnett"), the president, chairman of the board, and controlling stockholder of CNA, is suing Luquillo Beach for a so-called broker's fee of $300,000 allegedly earned for securing the mentioned financing with his principal, CNA. Meanwhile, in Civil Number 74–1147, Burnett's principal, CNA, is claiming a financing fee of $180,000 [3] from Luquillo Beach, and in Civil Number 74–1148 it is suing the president of Luquillo Beach, Ulpiano Barnes (hereinafter called ("Barnes"), for collection of a $50,000 promissory note which Barnes allegedly gave CNA as a "good faith" deposit to secure the financing commitment.

Originally, Luquillo Beach denied Barnes' authority to enter into the financing agreement with CNA. This position was discarded shortly before trial and Barnes' authority admitted as part of the proposed pretrial order.[4] Luquillo Beach, however, claims that neither CNA nor Burnett are entitled to any fees because they backed off from the financing in breach of the agreement. Furthermore, Luquillo Beach counterclaims for damages against both CNA and Burnett in the amount of $4,000,000 alleging a conspiracy and, shortly before the commencement of the trial, also expounded a breach of contract theory. The conspiracy allegations were dismissed against both Plaintiffs at the close of Luquillo Beach's case.

Meanwhile, Barnes rejected CNA's claim under the promissory note and counterclaims against CNA under a third party beneficiary theory, also seeking $4,000,000 in damages for the failure to provide the financing. Barnes furthermore filed a third party complaint against Luquillo Beach alleging the right to indemnity for any sums owed to CNA, relying principally on provisions of the corporate by-laws.

On or about the day of trial commencement, Barnes and Luquillo Beach, "to eliminate the issue as to which of them is entitled to damages for Burnac's [i.e. CNA's] breach of its loan contracts", entered into an interesting arrangement whereby any damages against CNA would be equally divided and awarded 50% each to Barnes and Luquillo Beach.[5]

With this general background behind us we now proceed to a more detailed analysis of the case.

In May, 1973, Barnes was looking to finance the condominium project previously referred to. Through a real estate broker named Félix Molina, he was referred to a Zoltan Roth, who although president of a mortgage brokerage firm by the name of Federal Mortgage Corporation was, in practice, an agent in Puerto Rico for Burnett and CNA. Mr. Roth contacted Burnett, who shortly thereafter met with Barnes in Puerto Rico. During the course of this trip Burnett visited the site of the proposed project and received a presentation from Barnes, including a copy of the preliminary plans. Barnes filed a detailed loan application for the financing of the first phase of the multi-phased development. The loan application was for $12,000,000 and it was clearly understood by Burnett that this amount, in addition to allowing for the construction of the first phase, would enable Barnes to buy out his partner [6] in the project and pay off all outstanding debts of Luquillo Beach.[7]

---

3. Reduced to this amount by Plaintiff during trial from the original amount claimed of $460,-050.

4. See our Order of October 11, 1977.

5. A classic case of "counting chickens before they are hatched."

6. Rafael Pagán Esmoris (hereinafter called Pagán) was Barnes' partner and brother-in-law, and the owner of the outstanding shares of Luquillo Beach. Pagán and Barnes had reached an oral agreement whereby Barnes could buy Pagán's share in Luquillo Beach provided certain conditions, dealing with security and method of payment, were complied with by Barnes.

7. These included a balance owed to a Hector Vicenty for the purchase of 75 shares of Luquillo Beach and a $1,200,000 mortgage to International Charter Mortgage Company.

At the time of the filing of the loan application Burnett requested a $50,000 good faith deposit, which was to be returned when the loan was closed. Since Barnes professed that neither he nor Luquillo Beach had such a sum available, Barnes offered his promissory note for this amount, which was refused by Burnett. Roth offered to loan Barnes $50,000, and in exchange for Roth's personal check for this amount, Barnes gave Roth a demand promissory note payable to Federal Mortgage Corporation. Burnett then accepted Roth's check as the good faith deposit.[8]

On or about July 16, 1973 Barnes traveled to Toronto, Canada wherein two mortgage commitments, for $10,000,000 and $2,000,000 respectively, were executed by Burnett and Barnes.

The $10,000,000 commitment (Joint Exhibit 5) provides for a $30,000 "good faith" deposit which "shall only be refunded upon the Closing", but which is not refundable if the loan fails to close by reason of any failure or default of the borrower. There is a further provision for the payment of a non-refundable loan fee of $460,050 pursuant to a schedule which requires the first payment of $180,000 to be "payable concurrently with the Closing." Additionally the borrower must pay a broker's fee to Burnett in the amount of $300,000, and to Federal Mortgage Corporation in the amount of $150,000, "concurrently with the closing." The commitment establishes that the closing shall occur on or before forty-five days, this time period being of essence, and releases the lender from any obligation to advance funds after the expiration of this time period.[9] There are several other conditions which need not be discussed for purposes of this opinion.

The $2,000,000 commitment (Joint Exhibit 6) provides for a $20,000 "good faith" deposit subject to conditions similar in nature to those already discussed, as well as an identical forty-five day closing requirement. Other provisions are also not presently relevant.

From Burnett's own testimony while on the witness stand as well as by his actions, it is clear beyond any doubt that notwithstanding the forty-five day time limit, CNA extended the said commitment for an indeterminate time period. As will be seen, Barnes also consented and acquiesced to this extension. The commitments thus became open-ended and it became incumbent upon CNA to bring matters to a head by setting a specific date for the closing. Of course, Barnes also could have requested such action. In our opinion, the credible evidence is that neither party did so act at any time of legal significance herein. Both were content to let matters ride for reasons not exactly altruistic.

In CNA's case, Burnett was engaged in jockeying for the purchase of the International Charter Mortgage, which was due on December 31, 1973. Burnett already had a purchaser for the land in question. While this was happening, the real estate market in Puerto Rico started to go sour. More significantly, CNA's principal source of financing, Larwyn Mortgage Investors, a California real estate investment trust, was beginning to feel the Stateside recession and withdrew its backing from the loan commitments. As a result of this, CNA rescinded the financing commitments to Luquillo Beach in early February, 1974.

In the meantime Barnes was content to let matters ride because he was having difficulties with his partner, Pagán. Either because Pagán reneged on his oral commit-

---

8. Thereafter Roth sold the promissory note of Barnes to a third party for $10,000. Subsequently Roth, with Burnett's acquiescence, purchased back the note for the same amount and gave the note to Burnett in exchange for his original $50,000 check. There is nothing in the record to explain the reason for these actions by Roth and Burnett, but, at the very least they suggest that there is less than an arms length relationship between them.

9. This forty-five day period is of prime importance to the present actions and counter-actions since the lender is completely relieved from the duty of specific performance after the term expires. However, any bilateral extension of said period results in an abandonment of the contractual immunity which CNA obtained.

ment to sell to Barnes or because he believed that Barnes could not fulfill his condition for selling out, Pagán was carrying out separate negotiations for the development of Luquillo Beach's property through his son-in-law, Manuel Pirallo (hereinafter called "Pirallo").[10] Sometime in November, 1973, Pirallo on behalf of Luquillo Beach, received a $11,000,000 construction loan commitment from a financial group called Capitol Mortgage Investments. This closing never took place because on March 11, 1974 Barnes wrote Capitol Mortgage and in effect informed them of a possible internal controversy within Luquillo Beach, between himself and Pagán.

The resolution of the legal consequences of these Byzantine intrigues is less complicated than would appear at first glance. The analysis is simplified if we again view separately, first, the actions brought by CNA and Burnett, and thereafter, the counterclaims of Barnes and Luquillo Beach.

 As previously intimated, a novation occurred regarding the financial agreements whereby, by mutual accord, these were extended beyond the original forty-five day period for an additional undetermined period of time.[11] These new agreements were what is referred to under Civil Law as a "pre-contract."[12] They created an agreement analogous to a Civil Law option on behalf of *both* the lender and the borrower.[13] The lender was obligated to keep open the financing for a reasonable period of time during which time he could demand performance by establishing a date for closing, and upon the failure of the borrower to meet at closing the obligations of the agreements, he could then claim the damages suffered by reason of said nonperformance. In our opinion, from the totality of the circumstances surrounding the original agreements, as well as the novation, and the practice in the industry, it was an implied condition of the extensions that the lender could also, after the passage of a reasonable period of time and upon the failure of the borrower to demand performance, withdraw from the financing.[14] How-

---

10. In fairness to Pagán it should be said that he was totally unaware of Barnes' actions vis-a-vis CNA and Burnett. He first learned of those dealings in early 1975 when Pirallo was served with the complaints in cases Numbers 74–1146 and 74–1147.

11. We realize that the granting of a term to the debtor or the waiver by the debtor of the term initially granted does not imply, in principle, a novation, since this merely affects the execution, and not the constitution of the obligation. See *Colón & Cía., Inc. v. Registrar*, 88 P.R.R. 77, 80–1 (1963); 3 Castan, Derecho Civil Español, Común y Foral 316 (8th ed. 1954). However, if we consider the nature of the clause modified, the intention of the parties, and the economic significance of the modification, the novation becomes more apparent. See *Colón, supra*; I–II Puig Brutau, Fundamentos de Derecho Civil 400–402 (1959). See *Merle v. West Bend Co.*, 97 D.P.R. 403 (1969) (intention of the parties). Furthermore, it is clear from the circumstances, notably the forbearance of the parties to the loan agreement, that it was not their intention to press their rights, regarding the time limitations. Cf. *Hernández v. Burgos*, 40 D.P.R. 460, 463 (1960). Even if we were to determine, which we do not, that the forty-five day period was a secondary condition of the agreement, its modification for purposes of extending indefinitely the date of closing novates the original obliga-

tion. See *Warner-Lambert v. Tribunal Superior*, 101 D.P.R. 378 (1973).

12. A precontract ("precontrato") is a binding preliminary contract which has as its *raison d'etre* the execution of another predetermined contract in the future. See 4 Castan, supra p. 25. The precontract satisfies the requirement of all civil law contracts, see 31 LPRA 3391, also including however, the content of the principal obligation and the period of time in which it is to be celebrated. Castan, op. cit. p. 31; cf. Blanco, Del Contrato de Promesa o Promesa de Contrato, XL Rev.Jur. UPR 31, 48 (1971).

13. See *Rosa Valentín v. Vázquez Lozada*, 103 D.P.R. 796 (1975); *Del Toro v. Blasini*, 96 PRR 662 (1968).

14. Since no period of time was stipulated or agreed upon, and since the preliminary contract does not allow one party to bind another indefinitely, it is our function to determine from the facts present, if a reasonable time transpired before demands were made or an appropriate withdrawal took place. See 31 LPRA 3064; *De La Haba v. Gay & Co.*, 52 D.P.R. 585 (1938); *Ramírez Ortiz v. Gautier Benítez*, 87 DPR 497 (1963); cf. *Prieto v. Hull Co., Inc.* 88 DPR 420 (1963); *Díaz Alvarez v. Alvarez Rodríguez*, 98 DPR 115 (1969); Blanco, op. cit. at 44.

ever, if it chose this latter course of action without demonstrating that it was "ready, willing and able" itself to perform (the best evidence of which was the requiring of a closing date from borrower), the lender is not in a position to also claim damages because, pursuant to the original agreements, the fees were due only upon "any failure or default on [the borrower's] part in complying with or performing . . . at the time" provided,[15] or "payable concurrently with the closing."[16] (emphasis supplied).

■ CNA, through Burnett, allowed until February, 1974 for Luquillo Beach to demand performance. It then withdrew without itself demanding performance. Thus, neither CNA nor Burnett are entitled to the claimed fees.[17]

■ Although we have serious doubts as to Barnes' standing to sue as a third party beneficiary of the financial commitments (see *A.L. Arzuaga, Inc. v. La Hood Const., Inc.*, 90 P.R.R. 101, 117 (1964)), as well as of the possibly speculative nature of the damages claimed by both Barnes and Luquillo Beach in their counterclaims, we need not reach these issues. The nature of the novation precludes their recovering in any event. Barnes and/or Luquillo Beach were re-

quired to demand performance within a reasonable period of time. As previously indicated, no such action was taken[18] because of Barnes' internal disputes with Pagán.[19] It is thus clear that neither Barnes nor Luquillo Beach exercised their rights within the period of time during which CNA was obligated to provide financing. They are therefore not entitled to any damages.

Considering the above, the complaints of CNA and Burnett, the counterclaims of Luquillo Beach and Barnes, and the third party complaint of Barnes against Luquillo Beach are dismissed. No costs are allowed to any of the parties. The Clerk shall enter Judgment accordingly.

IT IS SO ORDERED.

---

**15.** In the case of the "good faith" deposit.

**16.** In the case of the loan fee and Burnett's "broker's" fee.

**17.** Brokers agreements are not specifically treated by our Civil Code, but rather fall under the general category of agency ("mandato"). See 31 LPRA 4421 et seq.; *Torres v. Arbona*, 72 DPR 719 (1951). The broker must produce a lender who is "ready, willing and able" to enter into a contract with the borrower in order to be entitled to the broker's fee. Id. As we have seen, Plaintiffs have not established this condition because they failed to call a firm closing date. To allow CNA and its alter ego, Burnett, to collect fees for "services" whose fruition they have, if not impaired, at least passively undermined, would allow reward for contractual inaction under circumstances that closely resemble a failure of consideration

("inexistencia de causa"). See Manresa, Código Civil Español, Vol. 8, pp. 463–466, 5th Ed. (1950); *Del Toro v. Blasini*, supra at pages 668–669. By permitting the reasonable period to expire without actively seeking a closing, there was no lender "ready, willing and able" which entitled Plaintiff to damages.

**18.** We do not credit the oral evidence presented to the contrary. It is interesting to note that notwithstanding the plethora of documents presented, not a single shred of written evidence was introduced establishing a demand for a closing date by Barnes.

**19.** There is also considerable doubt in our mind as to whether all the documents required for closing were available.