# 99 DTA 171

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE SAN JUAN**
**PANEL IV**

CONSTRUCTORA ESTELAR, S.E., ING. EMILIO FAGUNDO, BONNIE BOOTHBY BERROCAL Y LA
SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Parte Recurrida

v.

AUTORIDAD DE EDIFICIOS PUBLICOS Y OTROS
Parte Peticionaria

Núm. KLCE-99-00277

San Juan, Puerto Rico, a 14 de mayo de 1999

Panel integrado por su Presidente, Juez Rossy García
y los Jueces González Rivera y Ortiz Carrión

Rossy García, Juez Ponente

## TEXTO COMPLETO DE LA RESOLUCION

El recurso instado en el caso del epígrafe interesa la revisión y revocación de una resolución dictada por el Tribunal de Primera Instancia, Sala.Superior de San Juan, en la que se denegó la solicitud presentada por la Autoridad de Edificios Públicos (A.E.P.) y la Administración de Vivienda Pública (A.V.P.) para que se determinara que el panel de árbitros designado para dilucidar ciertas controversias habidas entre éstos y la Constructora Estelar, S.E. (Estelar), carecía de jurisdicción por haber expirado el término pactado para la celebración de la vista de arbitraje. Al así dictaminar, resolvió el foro de instancia, además, que el referido planteamiento jurisdiccional era inmeritorio y caprichoso, ello como base para imponerle una sanción económica de $500.00 a cada una de las aquí recurrentes.

Inconformes con dicho dictamen, la A.E.P. y la A.V.P. recurren ante nos. Imputan que el tribunal recurrido incidió al determinar que el panel de árbitros tenía jurisdicción para adjudicar las controversias que le fueron sometidas, así como al imponerles la referida sanción. Resolvemos que el foro de instancia dictaminó con corrección al denegar la moción promovida por las peticionarias, y no encontramos abuso de discreción de su parte al imponer la sanción que se pretende aquí impugnar, por lo que resulta procedente denegar la expedición del auto solicitado.

Por la naturaleza del dictamen recurrido y los fundamentos de impugnación esgrimidos, resulta apropiado iniciar con una exposición de los antecedentes fácticos y procesales del caso.

### I

La A.E.P. y la A.V.P. suscribieron con Estelar seis (6) contratos de construcción para la remodelación de los siguientes complejos de vivienda, Residencial Torres de la Sabana, Residencial Ernesto Ramos Antonini, Residencial Manuel A. Pérez, Residencial Perla del Caribe, Residencial Margaritas II y Residencial Margaritas III. ██ Seaboard Surety Corp. (Seaboard) emitió fianza de pago y cumplimiento en cada uno de esos proyectos. ██

Según surge del expediente, el 15 de noviembre de 1995, alegando atrasos, la A.E.P. y la A.V.P. declararon en incumplimiento sustancial (default) a Estelar en los seis (6) contratos aludidos. Por su parte, Estelar declaró también en incumplimiento a la A.E.P. y la A.V.P. en los proyectos de los residenciales Torres de la Sabana y Ernesto Ramos Antonini. Así las cosas, la A.E.P. y la A.V.P. le requirieron a Seaboard, bajo las disposiciones del contrato de fianza, la asunción y terminación de las obras. El 7 de febrero de 1996, la A.E.P., la A.V.P., Seaboard y Estelar suscribieron contratos para la terminación de las obras (takeover agreements). Así, Seaboard se hizo cargo de completar las obras, ello bajo los términos de los contratos suscritos.

En los respectivos *"takeover agreements"* de los proyectos de los residenciales Torres de la Sabana y Ernesto Ramos Antonini, las partes dispusieron que lo relativo a la cuestión del incumplimiento contractual se resolvería mediante arbitraje y que cualquier otra causa de acción por daños causados por incumplimiento podría

ser iniciada ante los tribunales. ■ Las disposiciones sobre el arbitraje, que son las mismas en los dos contratos en cuestión, disponen, en lo pertinente, como sigue:

*"Notwithstanding contractual provisions under the General Conditions, particularly Article 15.2 (among others) and the limitations therein contained as to scope of any arbitration, the parties except as otherwise provide herein hereby agree and covenant to determine the propriety of the default issue and to submit said disputes to arbitration within thirty (30) days after the execution of this Agreement. This provision is to be construed as a "formal submission agreement". It shall not be necessary, indispensable or precondition that the architect issues any opinion or decision prior to commencement of arbitration proceedings. The final decision of the arbitration panel shall be binding on all parties who participate. The arbitrators shall be three (3) and will be selected under the provisions of Article 15.2 of the Contractual General Conditions. The arbitrators shall decide the disputes submitted to them pursuant to the Laws of Puerto Rico and the decisions shall conform to Law. The rules of the American Arbitration Association (AAA) shall not be applicable, except to supplement areas of controversy or doubt, in such event the applicable rules of the AAA shall be those that will become effective on March 31, 1996. The parties to the arbitration shall be entitled to discovery in a limited fashion, unless mutually agreed otherwise; namely each party shall be entitled to take a maximum of three (3) oral depositions per project; the parties shall exchange all relevant documents and shall be entitled to inspection of documents. Arbitrators shall admit into evidence only relevant documents, relevant regarding the issues submitted for decision and a limited periphery thereof.*

*Final hearing shall be held within 90 days from date hereof and unless mutually agreed the maximum hearing period shall be twelve full working days, with time allocated equally to each party, the time on cross examination shall be considered as time consumed by the party propounding the questions".* ■

El 15 de noviembre de 1996, transcurridos poco más de ocho (8) meses desde que los *"takeover agreements"* fueron suscritos, Estelar, el Ingeniero Emilio Fagundo, su esposa la Sra. Bonnie Boothby Berrocal y la sociedad legal de gananciales compuesta por ambos, presentaron demanda en contra de la A.E.P., la Administración de Desarrollo y Mejoras de Vivienda (A.D.M.V.) y Seaboard en la que solicitaron remedios invocando alegados incumplimientos contractuales y, además, basados en la culpa o negligencia de las demandadas. ■

Emplazada como fue, el 24 de diciembre de 1996 la A.E.P. presentó moción de desestimación en la que alegó que las partes habían acordado someter a arbitraje todas las controversias que surgieran de los contratos de construcción de los residenciales Torres de la Sabana y Ernesto Ramos Antonini. Añadió que se estaba llevando a cabo un procedimiento de arbitraje en el cual se dilucidarían todas las alegaciones que Estelar incluyó en su demanda. Estelar se opuso a la anterior solicitud señalando que sus reclamaciones concernientes a los proyectos en los residenciales Torres de la Sabana y Ernesto Ramos Antonini eran extracontractuales, no sujetas a arbitraje. Indicó, además, que en su demanda también incluyó reclamaciones concernientes a los restantes cuatro (4) proyectos de construcción para los cuales no se pactó arbitraje.

El 14 de febrero de 1997, el tribunal recurrido denegó la solicitud de desestimación con base en los argumentos en oposición presentados por Estelar. El 10 de marzo de 1997, la A.E.P. solicitó la reconsideración de este dictamen. Acogida como fue la reconsideración y luego de varios trámites judiciales, incluyendo la celebración de una vista argumentativa, el 3 de septiembre de 1997 el tribunal recurrido denegó la reconsideración solicitada. ■

Inconformes con dicho dictamen, la A.E.P. y la A.V.P. presentaron escrito de *certiorari* ante este Tribunal. El 8 de enero de 1998, un panel hermano denegó la expedición del recurso. Razonó éste que las cláusulas

contenidas en los *"takeover agreements"* de los proyectos de los residenciales Torres de la Sabana y Ernesto Ramos Antonini eran claras en limitar el procedimiento de arbitraje exclusivamente a la controversia referente al incumplimiento, por lo que no procedía la desestimación de la demanda.

Devuelta la causa al foro de primera instancia, y luego de múltiples trámites conducentes a la selección del tercer árbitro que compondría el panel de arbitraje, ■ el tribunal señaló para el 13 de octubre de 1998 una vista sobre el estado procesal del caso. Celebrada como fue, surge de la minuta correspondiente a dicha vista que se designó al licenciado Antonio Corretjer Piquer como tercer árbitro y presidente del panel. Así, en cumplimiento con lo dispuesto por el tribunal, el recién constituido panel de árbitros citó para primera reunión a celebrarse el 21 de diciembre de 1998. Al comienzo de ésta, la A.E.P. y la A.V.P. cuestionaron la jurisdicción del panel de árbitros. Adujeron que el término de noventa (90) días dispuesto en las cláusulas de arbitraje para que se celebrara la vista final de arbitraje comenzó a decursar a partir del 7 de febrero de 1996, fecha en que se suscribieron los *'takeover agreements'*, por lo que el mismo había expirado. Ante ello, el panel de árbitros determinó paralizar el procedimiento de arbitraje hasta que el tribunal resolviese este planteamiento jurisdiccional.

El 20 de enero de 1999, Estelar presentó moción al tribunal para que ordenase comparecer a la A.E.P. a mostrar causa por la cual el panel de árbitros carecía de jurisdicción. El tribunal señaló una vista para el 26 de enero de 1999. Celebrada como fue, surge de la minuta correspondiente a ésta que el tribunal le concedió a la A. E.P. y a la A.V.P. quince (15) días para que expusieran los fundamentos de su alegación jurisdiccional. El último día de dicho término, el 10 de febrero de 1999, la A.E.P., alegando cúmulo de trabajo de su representación legal, solicitó cinco (5) días adicionales para presentar su posición. El 12 de febrero de 1999, el tribunal emitió resolución en la que concedió a la A.E.P. diez (10) días adicionales para presentar su escrito. El 22 de febrero de 1999, el tribunal *a quo* emitió la resolución aquí impugnada.

Ante nos, la A.E.P. y la A.V.P. argumentan, como fundamento de revocación, que el tribunal recurrido erró al determinar que el panel de árbitros tiene jurisdicción para atender la controversia que se le sometiera toda vez que el plazo pactado para que se celebrara la vista final había expirado. Impugnan, además, la sanción económica que les fue impuesta.

## II

En Puerto Rico, el arbitraje comercial está regulado por lo dispuesto en la Ley Núm. 376 de 8 de mayo de 1951, según enmendada, 32 L.P.R.A. secs. 3201-3229. Es norma establecida que cuando los contratantes determinan resolver las disputas relacionadas al contrato mediante el procedimiento de arbitraje los tribunales no deben vulnerar dicho acuerdo, ya que existe una fuerte política pública a favor del arbitraje y toda duda respecto a la existencia o no de dicho procedimiento debe resolverse a su favor. *U.C.P.R. v. Triangle Engineering Corp.,* 137 D.P.R. ___ (1994), **94 J.T.S. 72,** a la pág. 11954; *World Films v. Paramount Pictures Corp.,* 125 D.P.R. 352, 357-358 (1990). El interés de promover el arbitraje como método para solucionar disputas se ve reflejado en la presunción de arbitrabilidad cuando el contrato tiene una cláusula de arbitraje. *U.C.P.R. v. Triangle Engineering Corp., supra; World Films v. Paramount Pictures Corp., supra.*

En el caso de autos, cuando Estelar presentó su demanda ante el tribunal ya habían pasado más de ocho (8) meses de suscritos los *"takeover agreements"* que obligaban al arbitraje y requerían que la vista final de éste se celebrara no más tarde de noventa (90) días de suscritos éstos. No obstante, fue la A.E.P. quien solicitó, petición a la que luego intentó unirse la A.V.P., la desestimación de la demanda alegando que estaba pactado, y en progreso, un procedimiento de arbitraje en el que se resolverían todas las alegaciones que Estelar incluyó en su demanda. Transcurridos más de dos (2) años, y luego de múltiples gestiones judiciales para lograr el nombramiento del tercer árbitro del panel, la A.E.P. y la A.V.P. se retractan e invocan la disposición contractual

que requería que la vista final de arbitraje se llevara a cabo no más tarde de noventa (90) días de suscritos los *"takeover agreements"*.

Decididamente, su conducta no demuestra un proceder de buena fe. Su justificación, cándida por demás, en cuanto a que advirtieron la existencia de la disposición en cuestión justo antes de acudir a la primera reunión ante el panel de árbitros, y que *"[p]ara evitar el malgasto de fondos públicos en la obtención de un laudo favorable que posteriormente pudiera ser impugnado por falta de jurisdicción por la parte demandante [Estelar]"*, ▓ no es aceptable. Si en efecto su cambio en conducta se debió a una inadvertencia temporal que eventualmente les produjo la preocupación de que Estelar pudiera impugnar con posterioridad el laudo que se emitiera en su día por el panel de árbitros, bastaba con que pactaran con Estelar prorrogar el término en cuestión, a lo que ya, por sus propios actos, había accedido. Sin embargo, éstas optaron por tomar un curso de acción contrario al procedimiento de arbitraje que ellas inicialmente invocaron, que defendieron por más de dos (2) años, y en el cual Estelar ha invertido gran esfuerzo y recursos económicos.

La conducta contradictoria no tiene lugar en el campo del Derecho, y debe ser impedida. *Pardo Santos v. Sucn. Stella Royo,* 145 D.P.R. ___ (1998), **98 J.T.S. 80,** a la pág. 1215; *Carabarín et al. v. A.R.P.E.,* 132 D.P.R. 938, 959 (1993); *Int. General Electric v. Concrete Builders,* 104 D.P.R. 871, 877 (1976). Vista la totalidad de las circunstancias presentes en el caso de autos, rehusamos cualquier interpretación que conduzca a un resultado contrario a la buena fe. El comportamiento conforme a la buena fe es precepto general que abarca toda actividad jurídica e impone a las partes un deber de lealtad recíproca. *Velilla v. Pueblo Supermarkets, Inc.,* 111 D.P.R. 585, 587-588 (1981). En palabras del tratadista Diez Picazo, la buena fe encarna:

*"[L]a lealtad en el tratar, el proceder honrado y leal. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes. Lo que se aspira a conseguir, se ha dicho, es que el desenvolvimiento de las relaciones jurídicas, en el ejercicio de los derechos y el cumplimiento de las obligaciones, se produzca conforme a una serie de principios que la conciencia jurídica considera necesarios, aunque no hayan sido formulados."*

Luis Diez Picazo, *La Doctrina de los Propios Actos*, Ed. Bosh, Barcelona, 1963, pág. 157.

Entre las doctrinas de derecho que emanan de tan importante precepto se encuentra la doctrina civilista de los actos propios, desarrollada para eliminar aquella conducta contradictoria contraria a la buena fe. Lo que ella veda es que un litigante adopte una actitud que le ponga en contradicción con su anterior conducta. Así, impide que se ejercite tardíamente un derecho, en forma contradictoria con una situación que tácitamente se ha admitido. ▓ Diez Picazo, *supra*, págs. 109 y 123. Por otro lado, su *"[e]fecto se produce de un modo objetivo, en el cual para nada cuenta la verdadera voluntad del autor de los actos. Se protege así la confianza que esos actos susciten en un tercero porque venir contra ellos constituiría un ataque a la buena fe"*. *Pardo Santos v. Sucn. Stella Royo, supra,* a la pág. 1215.

El contenido de la norma de que a nadie le es lícito ir contra los propios actos tiene su fundamento y génesis en el principio general de Derecho, de validez universal, que requiere proceder de buena fe en la vida jurídica. Su eficacia y fuerza vinculante tiene vida y efectos propios en consecución de un ideal de justicia, la protección de la confianza depositada en la apariencia.

Los elementos constitutivos para la aplicación de la norma jurídica de que nadie puede ir contra sus propios actos son: (a) una conducta determinada de un sujeto; (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás; y (c) que

sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada. José Puig Brutau, *Estudios de Derecho Comparado*, Ed. Ariel, Barcelona, 1951, pág. 112.

A la luz de esta doctrina, la A.E.P. y la A.V.P. se encuentran impedidas de impugnar su obligación de continuar con el procedimiento de arbitraje iniciado. Como antes mencionado, para llegar a tal conclusión no resulta pertinente la verdadera voluntad de éstas sino la cuestión objetiva de la conducta que desplegaron. Primero, invocan el procedimiento de arbitraje a pesar de que para esa fecha también había expirado el término al que ahora acuden. Segundo, ante el foro recurrido, y posteriormente ante este Tribunal, alegaron que el procedimiento de arbitraje abarcaba todas las controversias que surgieran de los contratos de construcción cuando éste se pactó exclusivamente para lo relativo al incumplimiento. Tal proceder, en el cual Estelar confió, alcanza a una renuncia del derecho a que la vista final del arbitraje se celebrara no más tarde de noventa (90) días de suscritos los *"takeover agreements"*. *"Es ilegítimo el ejercicio de un derecho cuando el titular excede manifiestamente los límites de la buena fe"*. *Velilla v. Pueblo Supermarkets, Inc., supra*, a la pág. 588. De otra parte, la aplicación de la doctrina de actos propios en el caso de autos no incide con elementos de política pública. En conclusión, la A.E.P. y la A.V.P. quedan impedidas, por sus propios actos, de adoptar una conducta inconsistente con un procedimiento de arbitraje que han apoyado y patrocinado por espacio de dos (2) años.

Por último, la A.E.P. y la A.V.P. cuestionan la sanción que el tribunal les impusiera al interpretar que su planteamiento jurisdiccional fue uno inmeritorio y caprichoso por no haber presentado los fundamentos en apoyo de éste dentro del término concedido por el tribunal. Primero, alegan que la resolución del tribunal de 12 de febrero de 1999 concediéndole un término adicional de diez (10) días para presentar su escrito se notificó el 17 de febrero, por lo que tenían hasta 1ro. de marzo, ya que el 27 de febrero era sábado, para presentar su escrito. Segundo, argumentan que su planteamiento no es inmeritorio ni caprichoso pues fue al prepararse para la vista ante el panel de árbitros que se percataron del vencimiento del término pactado.

Por su parte, Estelar señala que la resolución emitida por el tribunal recurrido el 12 de febrero de 1999 concediendo un término adicional de diez (10) días no se refiere a la solicitud de prórroga que presentó la A.E.P. sino a su moción original solicitando orden de 20 de enero de 1999, por lo que la prórroga solicitada nunca fue concedida.

A ninguna de las partes le asiste la razón en sus respectivas argumentaciones. En primer lugar, un análisis objetivo de la cuestión procesal en controversia decididamente demuestra que la resolución emitida por el tribunal el 12 de febrero de 1999 es la respuesta a la solicitud de prórroga hecha por la A.E.P. El 26 de enero de 1999, en una vista sobre el estado procesal del caso, el tribunal ordenó a la A.E.P. y a la A.V.P. que en un término de quince (15) días expusieran los fundamentos en que basaban su alegación de que el panel de árbitros no tenía jurisdicción. Este plazo expiraba el 10 de febrero. Ese mismo día, la A.E.P. presentó moción en la que alegó un gran cúmulo de trabajo de su representación legal, por lo que solicitó cinco (5) días adicionales; es decir hasta el 15 de febrero, para cumplir con su obligación. ▉ El 12 de febrero, el tribunal concedió un plazo adicional de diez (10) días; es decir, el doble del término solicitado. La A.E.P. nunca compareció en cumplimiento de la orden dentro del término en que alega vencía el término el 1ro. de marzo, sino que incluyó sus fundamentos en la moción de reconsideración a la resolución recurrida que presentó junto a la A.V.P. el 8 de marzo.

De otro lado, la interpretación dada por Estelar en su escrito de oposición a esta cuestión procesal es inconsecuente. Aun considerándose que la resolución del tribunal de 12 de febrero fue en respuesta a la moción original solicitando orden presentada el 20 de enero por ellos, en lugar de la solicitud de prórroga que presentara la A.E.P. el 10 de febrero, su efecto es el mismo. Ello es así toda vez que la moción de 20 de enero de Estelar lo

que solicitó al tribunal fue que ordenara a la A.E.P. y a la A.V.P. que expresaran los fundamentos en los que apoyaban su alegación jurisdiccional. Si en respuesta a ello el tribunal concedió un término adicional de diez (10) para que replicasen, significa, de igual manera, la concesión de un plazo adicional.

En definitiva, el tribunal recurrido no abusó de su discreción al sancionar a la A.E.P. y a la A.V.P. por su actitud abiertamente contradictoria, desprovista de fundamentos, ante un procedimiento de arbitraje que ellas mismas invocaron cuando Estelar presentó su demanda transcurridos más de ocho (8) meses de suscritos los 'takeover agreement'. No intervendremos con este ejercicio legítimo de su discreción.

## III

Por los fundamentos antes consignados, se deniega la expedición del auto solicitado.

Lo acuerda el Tribunal y así lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 99 DTA 171

**1.** La A.V.P. compareció como dueña de la obra, la A.E.P. como administradora de los contratos de construcción y Estelar como contratista general.

**2.** A su vez, en virtud de la fianza emitida por Seaboard, Estelar, el Ingeniero Emilio Fagundo, su esposa la Sra. Bonnie Boothby Berrocal y la sociedad legal de gananciales por ellos compuesta se obligaron a reembolsar a Seaboard por cualquier desembolso que ésta efectuase.

**3.** Estelar propuso que se resolvieran mediante arbitraje todas las disputas relacionadas a estos proyectos. Sin embargo, su propuesta no fue aceptada y se pactó someter a arbitraje exclusivamente la controversia sobre el incumplimiento de los contratos de construcción. Cualquier otra controversia surgida de los referidos contratos sería ventilada ante los tribunales.

**4.** Apéndice del Escrito de *Certiorari*, Anejos 1 y 2, págs. 4 y 13.

**5.** Posteriormente, la A.V.P. compareció voluntariamente al tribunal señalando que era ella, y no la A.D.M.V., la agencia encargada de la administración de las viviendas públicas. Así, para no atrasar los procesos, solicitó la correspondiente sustitución de parte.

**6.** Posteriormente, la A.V.P. presentó una moción para unirse a la solicitud de desestimación que presentara la A.E.P. la que resultó académica en virtud de lo dispuesto por el tribunal recurrido el 3 de septiembre de 1997.

**7.** Las partes ya habían seleccionado al ingeniero Jorge Guillermety y al Licenciado Antonio Moreda como árbitros del panel.

**8.** Escrito de *Certiorari*, pág. 8 (énfasis omitido).

**9.** De otra parte, conviene también puntualizar que bajo ciertas circunstancias la declaración de una sola persona obligándose frente a otra podría ser exigible cuando esa declaración fue hecha de forma expresa y la misma ha inducido a la otra persona a actuar confiado en ella. *Ramírez Ortiz v. Gautier Benítez*, 87 D.P.R. 497 (1963). El efecto mínimo que debe reconocerse a los actos unilaterales es que dejan establecido el impedimento de ir contra los actos propios. *Int. General Electric v. Concrete Builders, supra*, a la pág. 878.

**10.** Debemos puntualizar que la A.V.P. nunca solicitó prórroga para presentar su posición.